CONSUL, LTD., Appellant,

v.

TRANSCO ENERGY COMPANY, formerly known as Transco Companies, Inc., and Transcontinental Gas Pipe Line Corporation, Appellees. (Two Cases)

CONSUL, LTD., Appellee,

v.

TRANSCO ENERGY COMPANY, formerly known as Transco Companies, Inc., and Transcontinental Gas Pipe Line Corporation, Appellants.

Nos. 85-1729(L), 85-1971 and 85-1988.

United States Court of Appeals, Fourth Circuit.

Argued July 14, 1986.
Decided Nov. 14, 1986.

Dudley H. Chapman (Ward, Lazarus, Grow & Cihlar, Washington, D.C., Reginald F. Combs, House, Blanco & Osborn, P.A., Winston-Salem, N.C., on brief), for appellant/cross-appellee.

John L. Jeffers (David D. Sterling, Baker & Botts, Houston, Tex., Charles F. Vance, Jr., W. Andrew Copenhaver, Womble, Carlyle, Sandridge & Rice, Winston-Salem, N.C., on brief), for appellees/cross-appellants.

Before WIDENER and ERVIN, Circuit Judges, and HAYNSWORTH, Senior Circuit Judge.

ERVIN, Circuit Judge:

This case never crosses the threshold of antitrust analysis under § 2 of the Sherman Act.[1] There is a mismatch between the assumed natural monopoly power of the defendant, Transco, in the market for transporting gas along its pipeline and the relevant market for Sherman Act purposes that the plaintiff, Consul, has chosen to plead. Consul contended that the relevant product in question was natural gas at the wellhead and the relevant geographical area was comprised of two natural gas fields in Mississippi, plus unnamed sources of natural gas to which Consul might be wrongly denied access by Transco. Even assuming that such an area could be located with greater specificity, there can be no meaningful showing that Transco has monopoly power over this product in that area. As a result of this mismatch, Consul fails to manifest Transco's monopoly power in a relevant market and so loses its case at the threshold.

## I. THE PARTIES

Plaintiff-appellant Consul, Ltd. (Consul) is a consulting firm, organized as a North Carolina corporation, that engages in, among other things, the brokering of natural gas. It has done business in the Middle East and Europe, as well as North Carolina, Virginia, Texas, Mississippi and New York. Consul's sole shareholder and "key-man" consultant, Kenneth B. Wilson, teamed principally with a former Chairman of the North Carolina Utilities Commission, Tenney I. Deane, in efforts to arrange sources of natural gas for industrial users in the southeastern United States in the period before deregulation of gas.

Defendant-appellees Transco Energy Company, formerly Transco Companies, Inc., and Transcontinental Gas Pipe Line Corporation (collectively "Transco") are Delaware corporations with national offices in Houston, Texas. Transco operates a transcontinental natural gas pipeline that extends from Texas to New York. Transco transports natural gas through the pipeline for a fee. In that endeavor, it is regulated as a public utility by the Federal Energy Regulatory Commission (FERC, previously the Federal Power Commission). Transco also engages in brokering natural gas and, to that extent, it competed with Consul during the time leading up to this litigation.

## II. FACTUAL BACKGROUND

This dispute arose during a period of natural gas shortage in the 1970s. The shortage was exacerbated by federal regulations implemented by FERC. The regulations required that whenever natural gas from a particular field was sold in interstate commerce, that gas was thereafter dedicated to interstate sale and subject to interstate price controls. In contrast, intrastate gas was not regulated. Thus intrastate gas generally commanded a higher price than interstate gas. Accordingly, producers of natural gas sometimes withheld gas from the interstate market rather than subject it to price regulation.

To alleviate this problem, FERC adopted, in the early 1970s, certain exceptions to interstate price regulation. Among them were Order 2.68[2] and Order 533.[3] Under Order 2.68, producers could contract for the interstate sale of gas for sixty days without price regulation. No prior FERC approval was required for 2.68 sales. Under Order 533, producers could arrange two-year interstate sales without price regulation. Prior FERC approval, however, was required for 533 sales.

The Greens Creek natural gas field in Mississippi covers about four square miles near Transco's pipeline. The gas is owned by four separate producers, none of whom is a party in this case. In 1977, Transco sought to broker gas from this field. Because the Greens Creek producers wished

---

1. 15 U.S.C. § 2 (1982).

2. 18 C.F.R. § 2.68 (1986), *removed,* 51 Fed.Reg. 11716 (April 7, 1986) (removal effective April 1, 1986).

3. 18 C.F.R. § 2.79 (1986).

to avoid interstate price regulation, Transco applied for an exception from FERC: a two-year "limited term certificate," which was similar to the Order 533 exception.[4] FERC rejected the application.

Subsequently, Consul sought to broker the Greens Creek gas to its clients in the southeast. Transco was aware of these efforts. Consul proposed that the producers seek FERC approval for a two-year 533 sale, and while the 533 application was pending, immediately make a series of sixty-day 2.68 sales. All gas was to be transported through Transco's pipeline. The Greens Creek producers agreed to this scheme, pending a demonstration of Consul's ability to make the necessary arrangements.

To this end, Consul arranged a 2.68 sale from another field, the Holiday Creek field in Mississippi, to Public Service Company of North Carolina. Gas under that contract began to flow through Transco's pipeline on May 21, 1978, at the request of Public Service. Transco learned of Consul's involvement in the Holiday Creek sale later, after the gas had begun to flow. Transco was hostile to Consul's efforts because it wished to broker the Greens Creek gas to the exclusion of Consul. For disputed reasons, Transco cut off the gas flowing under the Public Service/Holiday Creek contract on May 24, 1978. This gas supply was restored for the duration of the sixty-day 2.68 sale after negotiations between Consul and Transco. Nevertheless, Consul lost commissions.

Based on the Holiday Creek sale, Consul was able to arrange four additional 2.68 sales from the Greens Creek field to Commonwealth Natural Gas in Virginia, to occur on July 1, September 1, November 1 and December 1, 1978. The Greens Creek producers also agreed to engage in a subsequent 533 sale. Transco initially refused to transport the gas under the contracts because of Consul's involvement. After negotiations, however, Transco agreed to transport the 2.68 sale scheduled for July 1. Transco also agreed to apply for FERC approval of the 533 sale, applications for such sales generally being made by the pipeline company.

While the 533 application was pending, Congress was formulating the Natural Gas Policy Act (NGPA). The NGPA began deregulation of natural gas prices.[5] The price disparity between interstate and intrastate gas began to be eliminated. Accordingly, 2.68 and 533 sales were no longer especially advantageous. In November, 1978, the NGPA became law.[6] FERC approved the 533 application at around the same time, but at a natural gas price that was not attractive to the Greens Creek producers. The producers then declined to contract with Consul for natural gas sales and arranged instead a favorable, long-term contract with Transco.

### III. LITIGATION BELOW

Consul brought this action following the failure of its 533 sale. Generally, Consul alleges that Transco conspired and used its monopoly power over the pipeline to preclude Consul from arranging purchases from the Greens Creek and Holiday Creek fields in violation of §§ 1 and 2 of the Sherman Act.[7] With regard to the monop-

---

4. See 18 C.F.R. § 2.70(b)(3) (1986) (codifying FERC Opinion 699–B, 39 Fed.Reg. 33206 (Sept. 16, 1974)).

5. For a summary of the regulatory system under the NGPA, see Pierce, *Reconsidering the Roles of Regulation and Competition in the Natural Gas Industry*, 97 Harv.L.Rev. 345, 348–51 (1983).

6. See Pub.L. No. 95–621, 92 Stat. 3352 (codified at 15 U.S.C. §§ 3301–3432 (1982)).

7. Sherman Act § 1, 15 U.S.C. § 1 (1982), is directed toward concerted activity: "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal," with certain provisos concerning resale price maintenance.

Sherman Act § 2, 15 U.S.C. § 2 (1982), reaches single-firm efforts at monopolization as well as conspiracies: "Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign na-

oly claim, Consul alleges that it lost commissions on the 2.68 sales in connection with Transco's refusal to facilitate those sales. Consul claims the loss of further commissions from the 533 sale on the basis of Transco's delay in filing the 533 application and obstructionism on the part of Transco, which allegedly caused FERC to postpone action on the application until passage of the NGPA. That is, Consul asserts that if Transco had not delayed the 533 approval process, the 533 sale would have been consummated, resulting in commissions for Consul. Consul also sought injunctive relief. That equitable claim is the subject of a separate proceeding.

Before trial, Transco moved for partial summary judgment on, among other things, the 533 claim. Transco argued that Consul offered insufficient evidence that Transco caused any damage to Consul in connection with the 533 sale. The district court granted the partial summary judgment in favor of Transco on October 31, 1984. 596 F.Supp. 432 (1984).

At trial, the district court directed a verdict against Consul on its claim under § 1 of the Sherman Act, since there was no evidence of a conspiracy. Consul does not appeal that ruling.

As to the § 2 claim, the jury found that Consul was damaged in the amounts of $24,000 for the interruption of gas from the Holiday Creek 2.68 sale and $216,300 for the loss of sales from Greens Creek. After entry of judgment for treble those damages pursuant to § 4 of the Clayton Act,[8] Transco properly moved for judgment notwithstanding the verdict ("n.o.v."). The district court granted this motion in two respects: first, that there was no evidence that Holiday Creek was a relevant market, hence the $24,000 award could not stand, and second, that $62,100 of the damages awarded by the jury for the fourth 2.68 sale from Greens Creek had no basis in the record, and hence could not stand. The district court also denied Consul's motion to transfer the injunctive aspect of the case

to the United States District Court for the Western District of North Carolina, Charlotte Division. Final judgment, after the damages were trebled, was entered for $462,600, on August 26, 1985.

## IV. DISPOSITION ON APPEAL

Consul now appeals the partial summary judgment entered against it on the 533 claim and the judgment n.o.v. on the Holiday Creek and the fourth Greens Creek 2.68 sales, as well as the denial of transfer. Transco cross-appeals the adverse jury awards on the first three Greens Creek 2.68 sales. Jurisdiction is proper under 28 U.S.C. § 1291 (1982). We conclude that the district judge correctly found that Consul failed to establish Holiday Creek as a relevant market for Sherman Act § 2 purposes, and so affirm that part of the judgment n.o.v. We further conclude that the same failure is equally fatal to the entire case. Consul's claim may sound in tort, but it is insufficient to invoke the protection of the antitrust laws. Thus, we affirm the partial summary judgment on the 533 claim and the judgment n.o.v. as to the fourth Greens Creek claim. We reverse the district court's refusal to grant judgment n.o.v. on the first three Greens Creek claims. The denial of the motion to transfer is affirmed as within the district court's discretion.

## V. DISCUSSION

### A. *The Relevant Market Requirement*

▇ Proof of a relevant market is the threshold for a Sherman Act § 2 claim. The plaintiff must establish the geographic and product market that was monopolized. This proposition has been practically incontrovertible since *Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp.*, 382 U.S. 172, 177, 86 S.Ct. 347, 350, 15 L.Ed.2d 247 (1965). *See, e.g., American Hoist & Derrick Co. v. Sowa & Sons*, 725 F.2d 1350, 1366–67 (Fed.Cir.), *cert. denied*,

tions, shall be deemed guilty of a misdemeanor...."

**8.** 15 U.S.C. § 15 (1982).

469 U.S. 821, 105 S.Ct. 95, 83 L.Ed.2d 41 (1984); *RCM Supply Co. v. Hunter Douglas, Inc.,* 686 F.2d 1074, 1076 (4th Cir.1982); *Photovest Corp. v. Fotomat Corp.,* 606 F.2d 704, 711–12 (7th Cir.1979), *cert. denied,* 445 U.S. 917, 100 S.Ct. 1278, 63 L.Ed.2d 601 (1980); *Spectrofuge Corp. v. Beckman Instruments, Inc.,* 575 F.2d 256, 276 (5th Cir.1978), *cert. denied,* 440 U.S. 939, 99 S.Ct. 1289, 59 L.Ed.2d 499 (1979); *FLM Collision Parts, Inc. v. Ford Motor Co.,* 543 F.2d 1019, 1030 (2d Cir.1976), *cert. denied,* 429 U.S. 1097, 97 S.Ct. 1116, 51 L.Ed.2d 545 (1977); *Coleman Motor Co. v. Chrysler Corp.,* 525 F.2d 1338, 1348 (3d Cir.1975); *E.J. Delaney Corp. v. Bonne Bell, Inc.,* 525 F.2d 296, 305 (10th Cir.1975), *cert. denied,* 425 U.S. 907, 96 S.Ct. 1501, 47 L.Ed.2d 758 (1976); *George R. Whitten, Jr., Inc. v. Paddock Pool Builders, Inc.,* 508 F.2d 547, 550 (1st Cir.1974), *cert. denied,* 421 U.S. 1004, 95 S.Ct. 2407, 44 L.Ed.2d 673 (1975); *Agrashell, Inc. v. Hammons Products Co.,* 479 F.2d 269, 286–87 (8th Cir.), *cert. denied,* 414 U.S. 1022, 94 S.Ct. 445, 38 L.Ed.2d 313 (1973).[9]

Consul, undaunted by the weight of this authority, claims to have found three theories on which § 2 liability can be rested without reference to a relevant market. In the alternative, Consul proffers the two natural gas fields, Holiday Creek and Greens Creek, as well as "all other sources of natural gas from which there is no presently economically feasible alternative means of transportation other than Defendants' pipeline"[10] as the geographical limits of a relevant market, and natural gas at the wellhead as the product in question. We are not convinced by either branch of the argument.

Consul strenuously urges that there is more than one type of § 2 claim; in fact, it argues, there are at least four types, of which three—"leveraging" cases, "essential facility" cases, and "market foreclosure" cases—are not concerned with market definition. We take no issue with the usefulness of Consul's typology or the aptness of these labels in describing forms of action under the Sherman Act. The fact remains that a relevant market must be proven under any of these theories. This is clear from a reading of the authorities cited by Consul. *See, e.g., Otter Tail Power Co. v. United States,* 410 U.S. 366, 369, 93 S.Ct. 1022, 1025, 35 L.Ed.2d 359 (1973) ("The aggregate of towns in Otter Tail's service area is the geographic market in which Otter Tail competes for the right to serve the towns at retail.").[11]

None is persuasive. Consul finds the beginnings of "essential facility" theory in *United States v. Terminal Railroad Association,* 224 U.S. 383, 32 S.Ct. 507, 56 L.Ed. 810 (1912), which, as Consul notes, predates the recognition of market definition as the indispensable element in Sherman Act analysis in *United States v. E.I. du Pont de Nemours & Co.,* 351 U.S. 377, 76 S.Ct. 994, 100 L.Ed. 1264 (1955). Nevertheless, *Terminal Railroad* evinces considerable concern for the particular effects of that defendant's actions on a particular market for rail transportation: St. Louis. *See* 224 U.S. at 392–407, 32 S.Ct. at 508–14; *see generally* Troy, *Unclogging the Bottleneck: A New Essential Facility Doctrine,* 83 Colum.L.Rev. 441 (1983) (arguing that essential facility cases fit, at the threshold, within traditional § 2 analysis, including market definition). This is the type of concern not presented by Consul's evidence, which cannot and does not establish the degree to which Transco has market power over natural gas at the wellhead. *Eastman Kodak Co. v. Southern Photo Materials Co.,* 273 U.S. 359, 47 S.Ct. 400, 71 L.Ed. 684 (1927), to which we are also referred, is wholly inapposite: in that case the question

**9.** Cases to the contrary appear in the Ninth Circuit. *See Blanton v. Mobil Oil Corp.,* 721 F.2d 1207, 1213 (9th Cir.1983) (plaintiff not required to prove a relevant market to show attempted monopolization under § 2 when defendant engaged in *per se* violations of § 1), *cert. denied,* 471 U.S. 1007, 105 S.Ct. 1874, 85 L.Ed.2d 166 (1985); *Lessig v. Tidewater Oil Co.,* 327 F.2d 459 (9th Cir.), *cert. denied,* 377 U.S. 993, 84 S.Ct. 1920, 12 L.Ed.2d 1046 (1964) (decided prior to *Walker Process*). But as the *Blanton* court made clear, the Ninth Circuit waives the requirement of proving a relevant market only in cases involving attempted monopolization rather than actual monopolization and in which the plaintiff shows either predatory conduct or a *per se* violation of § 1. *Blanton,* 721 F.2d at 1214. We follow the rule established in this and most of our sister circuits, that proof of a relevant market is always required.

**10.** Complaint at para. 30(c).

**11.** Consul cites numerous other cases in its attempt to allay the problem of market definition.

As Justice Frankfurter first noted,[12] and as this court recently reasserted, the relevant geographic market is the area in which buyers or sellers of the relevant product effectively compete. *See Satellite Television v. Continental Cablevision*, 714 F.2d 351, 357 (4th Cir.1983). The formulation approved by this court in *RCM Supply* is helpful: "the geographic market should consist of *an area in which the defendants operate and which the plaintiff can reasonably turn to for supplies.*" 686 F.2d at 1077 (emphasis in original). *See Tampa Electric Co. v. Nashville Coal Co.*, 365 U.S. 320, 327–34, 81 S.Ct. 623, 628–32, 5 L.Ed.2d 580 (1961). The penultimate question, towards which this preliminary inquiry into market definition is directed, is whether the defendant has market power: the ability to raise prices above levels that would exist in a perfectly competitive market.[13] The geographic demarcation should not be too tightly drawn, unless clear evidence exists that potential competitors outside the region are hindered from entering. A market drawn too tightly, either in geographic terms that exclude potential suppliers or in product terms that exclude potential substitutes, creates the illusion of market power where none may exist. *See Jayco Systems v. Savin Business Machines Corp.*, 777 F.2d 306, 319–20 (5th Cir.1985), cert. denied, —— U.S. ——, 107 S.Ct. 73, 93 L.Ed.2d 30 (1986); *American Key Corp.*

*v. Cole National Corp.*, 762 F.2d 1569, 1580–81 (11th Cir.1985); *cf. American Football League v. National Football League*, 323 F.2d 124, 129–30 (4th Cir.1963) (describing limits on market in terms of the defendant's activity, but viewing that activity broadly to include all locations where the defendant might choose to do business). Such a misleading start in antitrust analysis, always a difficult area for judicial resolution, *cf. Standard Oil Co. (California) v. United States*, 337 U.S. 293, 322, 69 S.Ct. 1051, 1063, 93 L.Ed.2d 1371 (1948) (Jackson, J., dissenting) (noting the difficulty raised by economic problems presented for judicial action in Clayton Act cases), makes accurate determination of the ultimate question—whether the antitrust laws have been violated—impossible.

**B.** *The Market Pleaded*

■ In this case, Consul urges that the relevant product is natural gas at the wellhead. The relevant geographical area pleaded is a strange amalgam of two natural gas fields in Mississippi plus any other areas in which Transco controls access to natural gas by virtue of the pipeline, but does not own the gas and would not transport it if Consul was able to broker it.

There is no way to establish Transco's market power in the market for natural gas at the wellhead on the basis of the

of monopolization had been settled in a prior and separate suit. *See id.* at 369, 47 S.Ct. at 402.

As for "leverage" theory, Consul itself acknowledges the need to prove monopolization in one market before examining the "leveraging" of that monopoly power in the separate market. In the case of *United States v. Crescent Amusement Co.*, 323 U.S. 173, 65 S.Ct. 254, 89 L.Ed. 160 (1944), cited by Consul, the relevant geographical market was clearly established: seventy-odd small towns in the mid-east. Similarly, in *United States v. Griffith*, 334 U.S. 100, 68 S.Ct. 941, 92 L.Ed.2d 1236 (1948), the monopolistic practices involved corporations in Oklahoma, Texas and New Mexico that owned the only movie theater in each of fifty-three towns. Nor do the "market foreclosure" cases to which Consul refers us offer a way around the requirement of market definition. The Court in *Times-Picayune Publishing Co. v. United States*, 345 U.S. 594, 73 S.Ct. 872, 97 L.Ed. 1277 (1953), struggled with the proper extent of the market

for newspapers. *See id.* at 610, 73 S.Ct. at 881 ("Once granted that the volume of commerce affected was not 'insignificant or insubstantial,' the Times-Picayune's market position becomes critical to the case.") (citation omitted). Likewise in *Lorain Journal Co. v. United States*, 342 U.S. 143, 72 S.Ct. 181, 96 L.Ed. 162 (1951), the Court examined the particular details of commerce in communication in and out of Lorain, Ohio, concluding that the Journal had "a substantial monopoly in its area." *Id.* at 154, 72 S.Ct. at 187.

**12.** *See Standard Oil Co. (California) v. United States,* 337 U.S. 293, 299 n. 5, 69 S.Ct. 1051, 1055 n. 5, 93 L.Ed. 1371 (1949).

**13.** *See, e.g.,* II P. Areeda & D. Turner, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* para. 517 (1978); R. Posner, *Economic Analysis of Law* 195–201 (2d ed. 1972).

above geographical limitation and the evidence presented by the parties.[14] The evidence did indicate that the producers at Greens Creek had numerous opportunities to sell gas to a large number of buyers other than Transco; that Transco bought only a small percentage of the gas produced in the county in which both fields lie; that Transco purchased gas all along its line from Texas to New York; and that the producers at Greens Creek considered attachment to the intrastate pipeline network a viable option. There is no indication that Consul's efforts to find sources of gas elsewhere in the country were foreclosed by Transco's power in the market. There is no reason to believe that circumstances rendered the two fields around which the instant events occurred economically significant portions of the national market for natural gas. *Cf. Brown Shoe Co. v. United States,* 370 U.S. 294, 336–37, 82 S.Ct. 1502, 1529–30, 8 L.Ed.2d 510 (1962) (regarding Clayton Act § 7). There is no way to measure Transco's market power in an area as ethereal as "sources of natural gas not owned by Transco but in close proximity to their pipeline and which would not be available to Consul as a broker under Transco's policies." While the market may not be measurable in "metes and bounds," *see Times-Picayune Publishing,* 345 U.S. at 611, 73 S.Ct. at 881, it should be demonstrable in other than purely hypothetical terms. In sum, there is no reason to believe that the geographic market pleaded covered

Transco's activities in a way that would encompass the area of effective competition between the parties, as brokers of natural gas.[15]

We conclude that the district court was correct in granting judgment n.o.v. on the fourth Greens Creek 2.68 contract and in granting summary judgment on the 533 contract.[16] We reverse the refusal to grant judgment n.o.v. on the other 2.68 contracts.

AFFIRMED IN PART AND REVERSED IN PART.

---

14. The Fifth Circuit has held that a natural gas field constituted a relevant geographic market under § 2 of the Sherman Act. *See Woods Exploration & Producing Co. v. Aluminum Co. of America,* 438 F.2d 1286 (5th Cir.1971), *cert. denied,* 404 U.S. 1047, 92 S.Ct. 701, 30 L.Ed.2d 736 (1972). Both parties in that case were owner/extractors of the gas field; their competition was tied to that field. In contrast, Transco can operate anywhere along the pipeline, and Consul is in the business of finding natural gas wherever it exists. Nothing inherent in the market, as Consul presented that market to us, links their competition to any one or two particular fields.

15. *Cf.* Pierce, *supra* note 5, at 381 (discussing Transco's power in the market for transportation of natural gas into North Carolina). This case in no way forecloses a showing that a

natural monopolist has violated the Sherman Act in a way analogous to *Otter Tail.* The plaintiff here, by focusing on the localized production source in Mississippi, has not presented us with the facts about the relevant market necessary for such a showing.

16. Consul raises several points on appeal in connection with the granting of summary judgment, which points are mooted by the failure to prove a relevant market. We therefore decline to discuss the adequacy of hearing afforded to Consul on its charge of regulatory obstruction, or the sufficiency of the evidence that Consul presented. All of the contested evidence, if admitted, would not establish an *antitrust* violation under Sherman Act § 2, absent a clearer showing of Transco's monopoly power in a relevant market.