**William T. CLARK and Prism Engineering and Measurement Company, Inc., Plaintiffs,**

**v.**

**FLOW MEASUREMENT, INC., a Georgia Corporation, d/b/a Hersey Measurement Company, Defendant.**

**Civil Action No. 6:95–4063–20.**

United States District Court, D. South Carolina, Greenville Division.

Dec. 4, 1996.

Moffatt G. McDonald, Greenville, SC, for plaintiffs.

Henry L. Parr, Jr., Greenville, South Carolina, for defendant.

## ORDER

HERLONG, District Judge.

This matter is before the court on the motion of the defendant, Flow Measurement, Inc. ("Flow Measurement"), for summary judgment. Flow Measurement alternatively filed a motion for partial summary judgment against William T. Clark ("Clark") individually. The plaintiffs, Clark and Prism Engineering and Measurement Company, Inc. ("Prism"), filed memoranda in opposition to both motions. There are also several motions pending regarding the designation and testimony of certain experts. For the purpose of this summary judgment motion, unless otherwise stated, the court assumes that all the evidence in the record is properly before it.

Clark and Prism allege that Flow Measurement used predatory pricing to force Prism out of the flowmeter business[1]. Specifically, the plaintiffs claim that Flow Measurement quoted a bid to Argonne National Laboratory ("Argonne") that was below costs. The plaintiffs further claim that the bid was designed to and had the effect of putting Prism out of business. In the complaint, Clark and Prism state causes of action under both the Sherman Antitrust Act ("Sherman Act") and the Robinson–Patman Price Discrimination Act ("Robinson–Patman Act"). The plaintiffs also state claims for violation of South Carolina's Unfair Trade Practices Act and intentional interference with a prospective contract.

Rule 56(c) of the Federal Rules of Civil Procedure states that summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Thus, "summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *see M & M Medical Supplies v. Pleasant Valley Hosp.,* 981 F.2d 160, 163 (4th Cir.1992). However, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510.

"In complex antitrust cases, no different or heightened standard for the grant of summary judgment applies." *Bathke v. Casey's Gen. Stores, Inc.,* 64 F.3d 340 (8th Cir.1995). "While Rule 56 is to be applied to antitrust cases no differently from how it is applied to other cases, that is not to say that the summary judgment device is not an appropriate and useful tool for resolving antitrust cases." *Thompson Everett, Inc. v. National Cable Advertising, L.P.,* 57 F.3d 1317, 1322 (4th Cir.1995). Furthermore, the court must keep constantly in mind that in the context of allegations of predatory pricing "the costs of an erroneous finding of liability are high." *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.,* 509 U.S. 209, 226, 113 S.Ct. 2578, 2589, 125 L.Ed.2d 168 (1993).

### Sherman Act & Robinson–Patman Act

The plaintiffs allege that Flow Measurement engaged in a predatory pricing scheme that violated both § 2 of the Sherman Act, 15

---

1. A flowmeter is a device that measures the rate of flow or quantity of a moving gas or fluid in an open or closed conduit.

U.S.C. § 2[2], and § 2(a) of the Robinson–Patman Act, 15 U.S.C. § 13(a). Section 2 of the Sherman Act provides:

> Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States or with foreign nationals, shall be deemed guilty of a felony.

15 U.S.C. § 2. Section 15(a) of the Sherman Act provides for a civil cause of action arising from a violation of this section. The Sherman Act prohibits predatory pricing "when it poses a dangerous probability of actual monopolization." *Brooke Group*, 509 U.S. at 222, 113 S.Ct. at 2587 (internal citations omitted).

Section 2(a) of the Robinson–Patman Act provides:

> It shall be unlawful for any person engaged in commerce, in the course of such commerce, either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality ... where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them.

15 U.S.C. § 13(a). "By its terms, the Robinson–Patman Act condemns price discrimination only to the extent that it threatens to injure competition." *Brooke Group*, 509 U.S. at 222, 113 S.Ct. at 2587.

"[T]he essence of the claim under either statute is the same: A business rival has priced its products in an unfair manner with an object to eliminate or retard competition and thereby gain and exercise control over prices in the relevant market." *Id.*

## ELEMENTS OF ANTITRUST

### A. Below Cost Pricing

■ "First, a plaintiff seeking to establish competitive injury resulting from a rival's low prices must prove that the prices complained of are below an appropriate measure of its rival's costs." *Id.; see Lifschultz Fast Freight, Inc. v. Consolidated Freightways Corp.*, 805 F.Supp. 1277, 1288 (D.S.C.1992), *aff'd*, 998 F.2d 1009, *cert. denied*, 510 U.S. 993, 114 S.Ct. 553, 126 L.Ed.2d 454 (1993).

Flow Measurement's expert, Dennis Luby ("Luby"), is a C.P.A. who specializes in accounting for manufacturers. (Luby Aff. ¶¶ 2–4.) Luby has served as Flow Measurement's outside accountant for every year except one that Flow Measurement has been in business. (Luby Aff. ¶ 4.) Luby examined all of the primary data associated with the Argonne job including the work papers used to prepare the audited financials, the actual invoices for the materials used, records showing the cost of labor, and computations of overhead. (Luby Aff. ¶ 6.) After comparing the actual costs of materials and outside processing, labor, and manufacturing overhead with the bid price on the Argonne job, Luby concluded that "the price received by Flow Measurement for the Argonne job exceeds the variable or direct cost of the job, the variable and fixed manufacturing costs of the job combined, and the total cost of the job." (Luby Aff. ¶¶ 7, 11.) In other words, Luby found that Flow Measurement made a profit on the Argonne job.[3] Although Flow Measurement bid the Argonne job at a low price, Luby found that the flowmeters were not priced below cost, because "Flow Measurement was able to purchase the materials for the Argonne job in large volumes and obtain substantial discounts in excess of 40% on some of the materials purchased for the Argonne job." (Luby Aff. ¶ 8.) Clark and Prism do not rely on their economics expert, Charles Alford ("Alford"), to refute Luby's

---

**2.** Section 2 of the Sherman Act, 15 U.S.C. § 2, is directed toward single-firm efforts at monopolization. Section 1 of the Sherman Act, 15 U.S.C. § 1, is directed toward concerted activity. *Consul, Ltd. v. Transco Energy Co.*, 805 F.2d 490, 492 n. 7 (4th Cir.1986), *cert. denied*, 481 U.S. 1050, 107 S.Ct. 2182, 95 L.Ed.2d 838 (1987).

**3.** Due to the sensitive nature of pricing information in the flowmeter market, the court declines to state in its order the exact amount of profit that Flow Measurement received. Suffice it to say that the amount was significant. (*See* Def.'s Mot.Summ.J. Ex. P.)

affidavit because, as Alford admits, he is not qualified to nor has he attempted to assess the actual costs that would be involved in a manufacturing process. (Alford Dep. at 20–21.) Instead, the plaintiffs rely on a statement made by an employee of Flow Measurement, Phil Kemp ("Kemp"), a document purportedly containing pricing information from 1991 and 1992, and the pure cost invoice reports provided by Flow Measurement during discovery.

### 1. Kemp Statement

■ Kemp is a district sales manager for Flow Measurement who started work when the Argonne job was nearly completed. (Hill Aff. ¶ 16.) As a district sales manager, Kemp's job duties do not include determining the profitability of any particular job. (Hill Aff. ¶ 16.) However, Kemp ·allegedly told Don Jenkinson ("Jenkinson"), an employee of Memeco Sales and Service Corp. which acts as a sales representative for companies that manufacture flowmeters, that Flow Measurement "took a bath" on the Argonne job. (Jenkinson Aff. ¶ 8.) Jenkinson relayed this statement to Clark, which precipitated the above-captioned case. (Clark Dep. at 151.)

First, Kemp's statement is hearsay within hearsay. *See* Fed.R.Evid. 801(c). The statement does not fit within the definition of non-hearsay as an admission of a party-opponent, because it was not made "by a person authorized by the party to make a statement concerning the subject," Fed.R.Evid. 801(d)(2)(C), nor was it made "by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship." Fed.R.Evid. 801(d)(2)(D). Furthermore, after reviewing the exceptions to hearsay contained within Rule 803 of the Federal Rules of Evidence, the court concludes that the statement is inadmissible.

■ Second, even if the statement were admissible, the court finds that it is equivocal at best. Clark and Prism cannot show whether Kemp meant that Flow Measurement bid the Argonne job below cost or whether Kemp meant that Flow Measurement made large cuts that resulted in a lower profit. "Conduct as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy." *Lifschultz,* 805 F.Supp. at 1288. Consequently, Kemp's statement does not allow Clark and Prism to survive summary judgment.

### 2. Pricing Document

■ Gary Anderson is a former employee of Flow Measurement and the brother-in-law of Clark. Once Clark initiated this lawsuit, Gary Anderson went back through some of the files that he took with him from Flow Measurement. (Gary Anderson Dep. at 48.) He produced to Clark a pricing document that contained pricing information from 1991 and 1992. *Id.* At his deposition, Rick Patterson ("Patterson"), a current district sales manager for Flow Measurement, explained that this pricing document was used to set list prices on the various target flowmeters. (Patterson Dep. at 39–41.)

Within this document is a column labeled "RWD" costs. (*See* Pls.' Mem. Opp'n Mot. Summ.J. Ex. L.) Robert W. Dumpert ("Dumpert") is an employee of Flow Measurement who is in charge of the target flowmeter line. (Dumpert Dep. at 20–25.) Clark and Prism assert that the costs reflected in the "RWD" costs column show how much each of the various target flowmeters cost to produce in 1991 and that the costs were prepared by Dumpert. The plaintiffs claim that these figures far exceed the bid that Flow Measurement quoted on the Argonne job. The plaintiffs, however, have failed to produce any evidence that this document is relevant to the Argonne job. Therefore, it cannot serve to refute the cost analysis performed by Flow Measurement's accounting expert Luby.

First, Gary Anderson is unaware of what the "RWD" costs stand for or whether they are accurate. (Gary Anderson Dep. at 56.) Second, Dumpert admits that he does compute the costs of materials and labor if asked to, but that he does not recall computing the "RWD" costs contained in the plaintiffs' document, where they came from, or what they represent. (Dumpert Dep. at 27–3, 49–50; Dumpert Aff. ¶ 5.) Third, even if the

"RWD" costs represented the costs of materials and labor on a job in 1991, there is no way to correlate that to the Argonne job. The fact is, the Argonne job represented such a large volume of flowmeters that Flow Measurement received significant discounts in materials. (Luby Aff. ¶ 16.) As such, "[t]he numbers shown in [the "RWD" costs] column in respect to the items sold to Argonne for the Argonne job are not in any way reflective of or related to the actual variable or total costs of producing those items in connection with the Argonne job during 1993 and 1994." (Luby Aff. ¶ 17.) As a result, this document is not sufficient to withstand summary judgment.

### 3. Pure Cost Invoice Reports

■ During discovery, Flow Measurement provided Clark and Prism with certain printouts from a computer program designed to estimate manufacturing costs. The plaintiffs contend that these pure cost invoice reports show that Flow Measurement's costs for producing target flowmeters exceeds the bid quoted on the Argonne job. Once again, there are serious flaws with the plaintiffs' evidence and their reliance on it.

After thoroughly reviewing the entire record, the court agrees with Luby's assessment of this data. The " 'pure cost' data produced by ... Flow Measurement do not show the actual costs of producing the Argonne job or any other particular order received by Flow Measurement." (Luby Aff. ¶ 15.) This is because "[t]he 'standard cost' and 'pure cost' figures generated by Flow Measurement's standard computerized software package are not based on actual overhead, labor, and material costs." (Luby Aff. ¶ 16.)

[T]he labor costs are simply extremely rough numbers, most of which were put into the computer program many years ago when the manufacturing operations were in a different location altogether. The overhead factor bears no relation to the actual overhead allocable to a particular job. The material costs are simply the cost of the last item actually received in the prior year. Because actual material costs vary with volume and over time, the material costs used to determine 'standard costs' and 'pure costs' do not indicate the actual costs for the material for any particular job.

*Id.* Furthermore, Tyler Evans ("Evans"), the Flow Measurement employee who was designated as most knowledgeable concerning costing methods, stated that one of the cost saving measures implemented at Flow Measurement was to stop trying to continually update the computer program that generated the pure cost invoices on which the plaintiffs are relying. (Evans Dep. at 26–27.) Due to the inaccuracy of the pure cost invoices produced by this computer program, outside accountants must make adjustments at the end of the year to determine exactly how profitable the company has been. *Id.* Faced with this unrefuted evidence, the plaintiffs cannot rely on the pure cost invoices to show that Flow Measurement bid the Argonne job below cost.

■ "[A] plaintiff cannot anchor its case on theoretical speculation that a defendant is pricing below [costs]." *Advo, Inc. v. Philadelphia Newspapers, Inc.*, 51 F.3d 1191, 1198 (3d Cir.1995). In light of the evidence presented by the C.P.A., Luby, the statement made by Kemp, the "RWD" cost document, and the pure cost invoice reports amount to theoretical speculation that Flow Measurement bid the Argonne job below cost. "[W]e have rejected ... the notion that above-cost prices that are below general market levels or the costs of a firm's competitors inflict injury to competition cognizable under the antitrust laws." *Brooke Group*, 509 U.S. at 223, 113 S.Ct. at 2588. This is because "[l]ow prices benefit consumers regardless of how those prices are set, and so long as they are above predatory levels, they do not threaten competition." *Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 340, 110 S.Ct. 1884, 1892, 109 L.Ed.2d 333 (1990). This principle has been adhered to regardless of the type of antitrust claim involved. *Id.* Consequently, summary judgment is appropriate on this issue alone.

However, even assuming that Clark and Prism were able to show that Flow Measurement engaged in below cost pricing, they cannot meet the second prerequisite of their antitrust claims.

## B. Recoupment

■ "The second prerequisite to holding a competitor liable under antitrust laws for charging low prices is a demonstration that the competitor had a reasonable prospect, or, under § 2 of the Sherman Act, a dangerous probability, of recouping its investment in below-cost prices." *Brooke Group*, 509 U.S. at 224, 113 S.Ct. at 2588. "That below-cost pricing may impose painful losses on its target is of no moment to the antitrust laws if competition is not injured: It is axiomatic that the antitrust laws were passed for 'the protection of competition, not competitors.'" *Id.* (citing *Brown Shoe Co. v. United States*, 370 U.S. 294, 320, 82 S.Ct. 1502, 1521, 8 L.Ed.2d 510 (1962)).

There are two specific areas of inquiry that must be addressed in determining recoupment. The first, relevant market, has long been a threshold element of § 2 of the Sherman Act. *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71, 86 S.Ct. 1698, 1704, 16 L.Ed.2d 778 (1966) (stating that one of the elements of monopolization under § 2 of the Sherman Act is "the possession of monopoly power in the relevant market"); *see also*, *United States v. E.I. duPont de Nemours & Co.*, 351 U.S. 377, 391, 76 S.Ct. 994, 1005, 100 L.Ed. 1264 (1956). More recent cases have found that "the essence of both a Sherman Act and Robinson–Patman Act claim is that a business engaged in unfair pricing in order to 'gain and exercise control over prices *in the relevant market.*'" *Bathke v. Casey's Gen. Stores, Inc.*, 64 F.3d 340, 344 (8th Cir. 1995) (quoting *Brooke Group*, 509 U.S. at 222, 113 S.Ct. at 2587). The reason that determining the relevant market is essential to a plaintiff's antitrust claim is that recoupment is impossible unless the offending party has sufficient market power, within that relevant market, to charge excessive prices for its product. *Consul, Ltd. v. Transco Energy Co.*, 805 F.2d 490, 495 (4th Cir.1986), *cert. denied*, 481 U.S. 1050, 107 S.Ct. 2182, 95 L.Ed.2d 838 (1987). Without being able to charge excessive prices, a business could not recover the money it lost from predatory pricing, and antitrust laws would not be implicated. *Id.*

The second area of inquiry for determining recoupment, proof of an economically viable scheme, was directly addressed in *Brooke Group*. The Supreme Court noted that the predatory scheme alleged by the plaintiffs must contain a detailed analysis of costs and the mechanism for recoupment so that the court can examine it carefully to determine whether it would sufficiently compensate a business for participating in the predation. *Brooke Group*, 509 U.S. at 225–26, 113 S.Ct. at 2589–90. This element of recoupment also has its basis in previous antitrust decisions. In *Grinnell*, the Supreme Court stated that one of the elements of monopolization under § 2 of the Sherman Act is "the willful acquisition or maintenance of [monopoly] power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *Grinnell*, 384 U.S. at 570–71, 86 S.Ct. at 1704. The only way for a plaintiff to show willful acquisition or maintenance of monopoly power is to provide evidence that the business accused of violating antitrust laws had an economically viable scheme in place. This stems from the fact that there is a strong inference that rational businessmen would not engage in activities that are economically senseless. *See Liggett Group, Inc. v. Brown & Williamson Tobacco Corp.*, 964 F.2d 335, 339 (4th Cir.1992); *Lifschultz*, 805 F.Supp. at 1288; *Advo*, 51 F.3d at 1198; *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Having stated the relevant areas of inquiry for determining recoupment, the court will address each in order.

### 1. Relevant Market

■ Recoupment requires the plaintiff to "establish the geographic and product market that was monopolized." *Consul, Ltd.*, 805 F.2d at 493. "[T]he relevant geographic market is the area in which buyers or sellers of the relevant product effectively compete." *Consul, Ltd.*, 805 F.2d at 495. "[I]n determining what constitutes a relevant market, 'no more definite rule can be declared than that commodities reasonably interchangeable by consumers for the same purposes make up' the relevant market." *International Wood Processors v. Power*

*Dry, Inc.,* 792 F.2d 416, 430 (4th Cir.1986) (quoting *E.I. duPont,* 351 U.S. at 395, 76 S.Ct. at 1007).

■ Clark and Prism assert that target flowmeters represent the relevant market. They start with the proposition that target flowmeters are almost exclusively suited to handle steam flow and water flow in large line sizes. (George Anderson Aff. ¶ 3.) They state further that Flow Measurement has a monopoly in this market. Clark and Prism also claim that target flowmeters represent a monopoly in certain specialized situations such as: (1) the Argonne job which is at issue in this case, (2) measuring superheated steam at one solar power plant in California, (3) measuring the flow of cooling water at one of the Tennessee Valley Authority power plants, (4) nuclear blowdown testing at the Savannah River Plant, (5) space shuttle refueling missions, (6) one atomic energy plant in Canada, (7) government space contracts, (8) solar energy applications, and (9) fluid control in ballistic missiles. (Clark Aff. ¶ 6, George Anderson Aff. ¶ 3.)

Flow Measurement has shown, however, that the Argonne job was also bid by Johnson Yokogawa, which manufactures a vortex meter. (Gary Anderson Dep. at 40–41; Hill Aff. ¶¶ 11–12.) Out of 3,270 flowmeters that Flow Measurement has sold since 1992, only sixty-five to seventy-five account for steam or water flow in large line sizes. (Hill Supp.Aff. ¶¶ 5(a)–(b), *see* Miller Supp.Aff. ¶ 2.) Moreover, Flow Measurement has shown that there is a large market for flowmeters that can handle steam and water flow in large line sizes, but that this market is dominated by propeller meters, magnetic flowmeters, and venturi meters. (Hill Supp.Aff. ¶ 5.) Even more telling to the determination of relevant market is the fact that the specialized markets listed by the plaintiffs represent no sales from Flow Measurement since it was created. (Hill Supp.Aff. ¶ 5, *see* Miller Supp. Aff. ¶ 3.) George Anderson, Clark's father-in-law and the one-time patent holder for target flowmeters, stated that a company could not survive supplying only the applications that exclusively require target flowmeters. (George Anderson Dep. at 16.) Any company that wanted to survive would have to compete in areas where other kinds

of meters are also used. *Id.* Clark himself even admits that there are other producers of target flowmeters such as West Coast Research, a European company named Turbo, and Foxboro. (Clark Dep. at 405–406.) Clark also admits that target flowmeters compete for business regularly with mag meters, thermal mass meters, corillis mass meters, turbines, v-cones, and orpheus meters. *Id.* at 31–32. Gary Anderson even stated that he had to consider the prices of other flowmeters when recommending prices for target flowmeters. (Gary Anderson Dep. at 12.)

The plaintiffs' tenuous argument also fails to take into account the fact that the market at issue includes products which can and are substituted for target flowmeters. Companies in the flowmeter business regularly adapt their products to conform to whatever job their flowmeter may be used for. *Id.* at 38–42, 38; (Miller Aff. ¶¶ 5–9; Hill Aff. ¶¶ 5–6.) "A market drawn too tightly, ... in product terms that exclude potential substitutes, creates the illusion of market power where none may exist." *Consul, Ltd.,* 805 F.2d at 495. After considering all of the evidence in the record, the court finds that Clark and Prism seek to define the relevant market too tightly. Therefore, the court concludes that the appropriate relevant market is one in which all manufacturers of flowmeters are considered competitors.

■ "In certain situations—for example, where the market is *highly diffuse and competitive,* or where new entry is easy, or the defendant lacks adequate excess capacity to absorb the market shares of his rivals and cannot quickly create or purchase new capacity—summary disposition of the case is appropriate." *Brooke Group,* 509 U.S. at 226, 113 S.Ct. at 2589 (emphasis added). As both parties admit, in the market of all flowmeters, Flow Measurement is a relatively small player. (George Anderson Dep. at 92; Miller Aff. ¶ 6.) As a small player in the overall flowmeter market, Flow Measurement is unable to control that relevant market. As such, Clark and Prism's antitrust claims must also fail based on this element. However, assuming that the relevant market is target flowmeters, Clark and Prism's anti-

trust causes of action would still fail as a matter of law.

## 2. Predatory Scheme

■ Recoupment also requires the plaintiffs to "demonstrate that there is a likelihood that the predatory scheme alleged would cause a rise in prices above a competitive level that would be sufficient to compensate for the amounts expended on the predation, including the time value of the money invested in it." *Id.* at 225, 113 S.Ct. at 2589. "Determining whether recoupment of predatory losses is likely requires an estimate of the cost of the alleged predation and a close analysis of ... the scheme alleged." *Brooke Group,* 509 U.S. at 226, 113 S.Ct. at 2589.

■ Thus, Clark and Prism are required to offer specific analysis of the estimated cost of the alleged predation and a close analysis of Flow Measurement's alleged scheme for recovering these costs. The plaintiffs have failed to do either. When asked if he had made any attempt to determine what Flow Measurement's costs on the Argonne job actually were, plaintiffs' expert Alford responded that he had not. (Alford Dep. at 20–21.) It is axiomatic that if Alford has not computed the costs of the Argonne job to Flow Measurement, then he would be unable to determine any losses that were sustained by predatory pricing.

Apart from the "RWD" costs and the pure cost invoice reports, the plaintiffs have not submitted any proof of the costs of predation to Flow Measurement. Even if the court accepted the "RWD" cost column or the pure cost invoices as accurate, they still fail to take into account all of the costs that would be associated with the Argonne job; specifically, the time value of the money invested and, in the case of the "RWD" costs, overhead. The documentation that the plaintiffs have submitted, if it were accurate with respect to the Argonne job, might show below cost pricing, but it cannot show the cost of the alleged predation to Flow Measurement.

Apparently the plaintiffs seek to have the court make this determination based on a comparison of the "RWD" costs column or the pure cost invoice reports with the actual bid on the Argonne job. Obviously, any pertinent analysis of the costs of predatory pricing must originate from the plaintiffs. Once again, the failure of proof on this element alone is enough to require the court to grant summary judgment, but the plaintiffs' antitrust claims also fail because the plaintiffs cannot sufficiently show that Flow Measurement has an economically viable scheme for recoupment.

■ The only specific evidence of a scheme for recoupment that Clark and Prism have presented is that Flow Measurement raised its prices on some products and that it raised its prices by fifty-seven percent on an electronic transmitter. "[A] price increase does not in itself permit a rational inference of ... supra competitive pricing." *Brooke Group,* 509 U.S. at 237, 113 S.Ct. at 2590. The court has reviewed the list prices submitted by the plaintiffs from 1993 and 1994. (*see* Pls.' Mem.Opp'n Mot.Summ.J. Exs. Q and R.) With no specific testimony to the contrary, the court must conclude that the price increases simply reflect normal growth in the market. The Supreme Court has made it clear that "rising prices are equally consistent with growing product demand." *Brooke Group,* 509 U.S. at 237, 113 S.Ct. at 2590. By affidavit, Flow Measurement has also shown that the fifty-seven percent increase in the price of the electronic transmitter reflects a change in that component part. (Hill Supp.Aff. ¶ 2(a).) Whereas Flow Measurement used to make its own electronic transmitter, it now contracts to have the transmitter provided by an outside manufacturer. *Id.* According to Flow Measurement, the new transmitter is more reliable and easier to fix, but it is also more expensive. *Id.* Because of the fear that customers would turn to other products, Flow Measurement has not been able to pass on the entire price of this transmitter to its customers. *Id.* at ¶ 2(b). Therefore, although Flow Measurement is charging more for its completed flowmeter, it is in actuality making less money per flowmeter. *Id.* The plaintiffs have not refuted this testimony.

■ "If market circumstances or deficiencies in proof would bar a reasonable jury from finding that the scheme alleged would

likely result in sustained supra competitive pricing, the plaintiff's case has failed." *Brooke Group,* 509 U.S. at 226, 113 S.Ct. at 2589. It is clear that the deficiencies in proof enumerated above also would require the court to grant summary judgment based on this element of the antitrust claim.

In conclusion, because Clark and Prism are unable to sufficiently show: (1) that Flow Measurement bid the Argonne job below cost, (2) that Flow Measurement has controlling market power in the relevant market, or (3) that Flow Measurement has an economically viable scheme for recoupment, the court is constrained to grant summary judgment on both of the antitrust claims.

## SOUTH CAROLINA UNFAIR TRADE PRACTICES ACT

In addition to their antitrust claims, Clark and Prism also alleged claims based on the South Carolina Unfair Trade Practices Act ("SCUTPA"), S.C.Code Ann. § 39–5–20 (Law.Co-op.1976). One of the elements of the SCUTPA is that the wrongful conduct must affect the public interest. *Noack Enter., Inc. v. Country Corner Interiors, Inc.,* 290 S.C. 475, 351 S.E.2d 347 (App.1986). Because the only public interest that could be affected in this case is competition, the plaintiffs' SCUTPA claim rises and falls with their antitrust claim. *See Blanton Enter., Inc. v. Burger King Corp.,* 680 F.Supp. 753, 768 (D.S.C.1988). Therefore, having granted summary judgment on the antitrust claims, the court must also grant summary judgment on the SCUTPA claim.

## INTENTIONAL INTERFERENCE WITH A PROSPECTIVE CONTRACT

█ Clark and Prism's final claim is for intentional interference with a prospective contract. To state a claim for intentional interference with a prospective contract, the plaintiffs must prove: "(1) the defendant intentionally interfered with the plaintiff's potential contractual relations; (2) for an improper purpose or by improper methods; (3) causing injury to the plaintiff." *Crandall Corp. v. Navistar Int'l Transp. Corp.,* 302 S.C. 265, 395 S.E.2d 179 (1990).

The court's determination of the antitrust claim is also dispositive of the plaintiffs' claim for intentional interference with a prospective contract. Having concluded that Flow Measurement's bid did not violate antitrust laws, the plaintiffs cannot show that Flow Measurement had an improper purpose or used improper methods when it was awarded the Argonne job. Consequently, the court also grants summary judgment on this claim.

In light of this order, the court notes that the motion for partial summary judgment along with the motions regarding the testimony and designation of certain expert witnesses are now moot.

Accordingly, it is

**ORDERED** that Flow Measurement's motion for summary judgment is granted.

**IT IS SO ORDERED.**