**VICTUS, LTD., d/b/a Master Design Furniture, Plaintiff,**

v.

**COLLEZIONE EUROPA U.S.A., INC., Defendant.**

No. 2:97CV00138.

United States District Court, M.D. North Carolina.

Oct. 26, 1998.

Gilbert J. Andia, Jr., Howard A. MacCord, Jr., Greensboro, NC, for Plaintiff.

Peter J. Juran, Winston–Salem, NC, Nicholas Mesiti, Albany, NY, for Defendant.

## MEMORANDUM OPINION

TILLEY, District Judge.

For the reasons stated below, summary judgment in favor of the Plaintiff on the Defendant's antitrust counterclaim is GRANTED, sua sponte. Moreover, Defendant's Motion for Attorneys' Fees and Expenses pursuant to 35 U.S.C. § 285 is DENIED. Given that no claims or counterclaims remain, this case will be DISMISSED.

### I.

Plaintiff Victus, Ltd., d/b/a Master Design Furniture ("Master Design") is a corporation that produces furniture and sells it, among other places, at its place of business in Greensboro, North Carolina. Defendant, Collezione Europa U.S.A., Inc. ("Europa"), is a corporation that produces furniture and sells it, among other places, at its place of business in High Point, North Carolina.

Master Design is the assignee of United States Design Patent No. 369,045 ("the '045 patent"), issued on April 23, 1996, and titled "Table." In applying for a patent, Master Design attempted to include versions of the table with wooden parquet tops, with glass tops, and with glass tops and wooden parquet shelves beneath. The patent examiner rejected the attempt to include more than one type top in the patent. The final drawings consequently depict several variations of a table, all with the same grooved leg ·and apron design and all with similar wooden parquet tops.[1]

Europa sells a group of tables, known as T1195 tables, which have the same or a very similar grooved leg and apron design as that found in Master Design's Design Patent No. 369,045, but which have glass tops. Master Design filed suit in this Court on February 17, 1997, alleging that Europa's tables infringe its patent. Europa counterclaimed, alleging that Plaintiff's infringement suit constituted an attempt to monopolize, in violation of the antitrust laws, specifically the Sherman Act, 15 U.S.C. § 2. The patent-infringement suit was dismissed on August 3, 1998 by the granting of Partial Summary Judgment in favor of Europa. (Mem. Op.[Doc.# 58].) Now, the Court, sua sponte, considers whether summary judgment should issue concerning Europa's antitrust counterclaim.

The Court has jurisdiction over this case pursuant to 28 U.S.C. §§ 1338(a) and 1338(b). Venue is proper pursuant to 28 U.S.C. § 1400.

### II.

Fed.R.Civ.P. 56 does not expressly provide that district courts may enter summary judgments sua sponte; however, "there can be little doubt that district courts inherently possess that power." *United States Dev. Corp. v. Peoples Fed. Sav. & Loan*

---

1. The prosecution history of this patent is discussed more fully in Part IV(d), *infra*.

Ass'n., 873 F.2d 731, 735 (4th Cir.1989). Before such power is exercised, the losing party must be given notice that it will have the opportunity to defend its claim. *Id.* An evidentiary hearing is not always required, *see Pension Benefit Guar. Corp. v. Mize Co.*, 987 F.2d 1059, 1061 (4th Cir.1993), but the party against whom judgment is entered must have "had a full and fair opportunity to develop and present facts and legal arguments in support of its position," *Portsmouth Square, Inc. v. Shareholders Protective Comm.*, 770 F.2d 866, 869 (9th Cir.1985).

■ In order for the Europa antitrust claim to survive, Europa must succeed on several essential issues; however, two primary issues are the focus of this Opinion. First, Europa is required to show that Master Design's original patent infringement suit was "objectively baseless." *See* discussion *infra* Part IV. Second, Europa must show that a "relevant antitrust market" existed. *See* discussion *infra* Part V. This summary judgment is based on Europa's inability to demonstrate either criterion as a matter of law. However, before delving into the analysis of these issues, some discussion is required in order to demonstrate that a sua sponte summary judgment is appropriate in this case because Europa had ample notice and opportunity to present its arguments regarding these topics.

On September 17, 1998, the Court issued an order requiring the parties to appear at a hearing on September 25, 1998, in order (1) to be heard on the issue of whether the original infringement case was "objectively baseless," and (2) to give the Defendant the opportunity to forecast the evidence upon which it would rely at trial to establish a "relevant market."[2] (Order [Doc. # 76], at 1.) Europa was required to authenticate the evidence it intended to forecast according to Fed.R.Civ.P. 56. (*Id.*) At the hearing, the Court reiterated the fact that if Europa did not make a sufficient showing of evidence on these two issues, the antitrust claim would not proceed to trial. Europa arrived prepared: it presented the Court with a three-ring binder of additional evidence to support its claim, including affidavits, deposition transcripts, copies of letters, and copies of Master Design's marketing materials. Both of the issues mentioned above were discussed by the parties and the Court at length, with opportunities for argument and rebuttal.

Regarding a sua sponte summary judgment, the Fourth Circuit has stated that, "[w]hile notice [to the losing party that it must come forward and defend its claim] need not necessarily be a formal document, ... it should provide the full ten days called for by Fed.R.Civ.P. 56(c)." *United States Dev. Corp.*, 873 F.2d at 735 (citations omitted). As is obvious from the dates recited above, ten days were not provided to the parties between official court notice of the hearing and the hearing itself. However, the Fourth Circuit also has stated that "extraordinary circumstances may justify departures from the ten-day notice requirement." *Id.* at 735 n. 3 (citing *Portsmouth Square*, 770 F.2d at 868–69). In *Portsmouth Square, Inc.*, the Ninth Circuit upheld a sua sponte summary judgment decision made after a pretrial conference in which the parties argued the merits of the claims. *Portsmouth Square*, 770 F.2d at 869. The losing party in that case had no advance warning that the court intended to raise a dispositive issue at the pretrial conference, and the party was denied the opportunity to respond with affidavits and other evidence in support of its claim. *Id.* at 868–69. However, citing efficiency, the conservation of judicial resources, and the fact that discovery for the case had been closed, the Ninth Circuit determined that the losing party had "adequate time to develop the facts on which [it] would depend to oppose summary judgment," and "was afforded a full and fair opportunity to make its case." *Id.* at 869.

The instant case presents a much easier scenario than *Portsmouth Square* for concluding that due process was satisfied. While Europa did not have ten days to prepare specifically for the hearing on September 25, 1998, it had substantial notice to prepare for these dispositive issues in contention at the hearing. First, the discovery

---

**2.** The Order also specified that two other topics would be discussed: a motion to disqualify Plaintiff's counsel, and a Motion in Limine from the Defendant. (Order [Doc. # 76], at 2.)

period ended on December 15, 1997, and the trial in this matter was originally scheduled for July 13, 1998. Pursuant to that trial date, Europa discussed both of these issues in its first Trial Brief, submitted on June 23, 1998. (*See* Def. Trial Br. [Doc. # 51], at 26, 27.) On July 9, 1998, the parties were informed that the trial would be delayed two weeks, and on July 23, 1998, the trial was formally reset for October 5, 1998. Therefore, Europa should have been prepared to argue both of these issues in early July.

Additionally, after the trial's postponement, Europa discussed these issues in its Revised Trial Brief, submitted on September 15, 1998. (*See* Def. Rev. Trial Br. [Doc. # 68], at 10, 12–13, 14–16.) Moreover, the "relevant market" issue was the subject of a Motion in Limine by Master Design, (*see* Mot. in Limine [Doc. # 56]), to which the Defendant responded on July 27, 1998 with a brief addressing this issue. (*See* Def. Br. Resp. Pl.'s Mot. Limine [Doc. # 57], at 4–6.) The Order denying the Plaintiff's Motion in Limine, issued on September 16, 1998, clearly stated that "at a hearing prior to trial, the Defendant must prepare a forecast of the evidence it will rely upon to establish that a relevant market existed. If the Defendant is unable to present evidence sufficient to support a verdict on this issue, then the Defendant's antitrust claim must be dismissed." (Mem. Order [Doc. # 75], at 5.) Finally, the next day, the Court issued its Order formally setting the date of the hearing and requiring that the Defendant forecast its evidence in accordance with Fed.R.Civ.P. 56. (Order [Doc. # 76], at 1.) The hearing was held as scheduled, with neither party requesting additional time to prepare. At the hearing, the Court repeatedly emphasized that if Europa did not make a sufficient showing on these issues, then the case would be dismissed.

In sum, blind adherence to the "ten-day rule" is not necessary in this case in order to provide Europa with proper due process. Given that the trial was originally scheduled for July 13, 1998, the essential facts needed by Europa to argue its case were developed well before the notice of the hearing was provided on September 17, 1998. Europa was fully prepared to argue its perspective on the issues of whether the infringement suit was "objectively baseless," and whether a "relevant market" existed. Under these circumstances, the issuance of a sua sponte summary judgment is proper.

### III.

Summary judgment, whether sua sponte or on motion from a party, is appropriate only if there is no genuine issue as to any material fact. Fed.R.Civ.P. 56(c). The party opposing summary judgment may not rest on its pleadings, but must provide evidence or point to evidence already in the record, properly authenticated pursuant to Rule 56(e), that would be sufficient to support a jury verdict in its favor. *See* Fed.R.Civ.P. 56(e); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Scosche Indus., Inc. v. Visor Gear Inc.*, 121 F.3d 675, 681 (Fed.Cir.1997). The test to be applied in determining sufficiency of the evidence on the questioned point, therefore, mirrors that applied at the directed verdict (now "judgment as a matter of law") stage of a trial. *See U.S. Philips Corp. v. Windmere Corp.*, 861 F.2d 695, 702–03 (Fed.Cir.1988). Summary judgment is appropriate if no reasonable jury could find for the party opposing summary judgment: the question at the summary judgment stage is whether "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250, 106 S.Ct. 2505. Rule 56(c) mandates entry of summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

Europa's antitrust suit is based upon the claim that Master Design brought its patent infringement suit in an attempt to monopolize the market of "casual contemporary wooded occasional tables sold within the United States." Petitioning the government for redress from a competitor's behavior, such as through litigation, is generally behavior that is immune from antitrust liability. *California Motor Transport Co. v. Trucking*

*Unlimited,* 404 U.S. 508, 512–13, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972); *Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc.,* 365 U.S. 127, 144, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961) ("*Noerr*"). However, that immunity is withheld if the litigation is a "mere sham to cover . . . an attempt to interfere directly with the business relationships of a competitor." *Noerr,* 365 U.S. at 144, 81 S.Ct. 523. To be considered "sham" litigation, the lawsuit must be "objectively baseless," *and* the lawsuit must be brought with the subjective intent to interfere directly with the business relationships of a competitor. *Professional Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.,* 508 U.S. 49, 60–61, 113 S.Ct. 1920, 123 L.Ed.2d 611 (1993) ("*PRE*").[3]

 Even if the lawsuit is deemed to be a "sham" because it satisfies both the objective and subjective components of the *PRE* test, the antitrust plaintiff must still prove a substantive antitrust violation. *Id.* at 61, 113 S.Ct. 1920 ("Proof of a sham merely deprives the [antitrust] defendant of immunity; it does not relieve the [antitrust] plaintiff of the obligation to establish all other elements of his claim."). Therefore, in order to succeed on its attempted monopolization claim, Europa must also prove: (1) predatory or anti-competitive conduct; (2) a specific intent to monopolize; and (3) a dangerous probability of achieving monopoly power. *Spectrum Sports, Inc. v. McQuillan,* 506 U.S. 447, 456, 113 S.Ct. 884, 122 L.Ed.2d 247 (1993). All three elements are necessary for liability under the Sherman Act. *Id.* Additionally, a "threshold" requirement to an antitrust claim is that the antitrust plaintiff must be able to prove a "relevant market" that the antitrust defendant attempted to monopolize. *Consul, Ltd. v. Transco Energy Co.,* 805 F.2d 490, 493 (4th Cir.1986) (requiring that antitrust plaintiffs must establish the geographic and product market that was monopolized in order to move forward with their claim).

In the instant case, summary judgment is granted in favor of Plaintiff Master Design

on Europa's attempted monopolization claim for two, independently-sufficient reasons. First, Europa, the antitrust plaintiff in this case, is unable to show that Master Design's patent infringement suit was "objectively baseless"; therefore, Europa's counterclaim fails the *PRE* test and Master Design is immune from antitrust liability under the *Noerr* doctrine. Second, Europa's counterclaim fails the *Consul, Ltd.* requirement, because it was unable to provide sufficient evidence that would enable a reasonable jury to conclude that a relevant market existed and could be reasonably defined. Both showings would be necessary for Europa to succeed at trial.

### IV.

#### (a).

Europa alleges that Master Design, the plaintiff and antitrust defendant, initiated a patent infringement suit that Master Design knew to be baseless. According to Europa, Master Design knew that it had amended its patent application and that the final design did not cover the glass top table produced by Europa.

 As previously discussed, to meet its burden, Europa must show that Master Design's infringement suit was "objectively baseless." "Objectively baseless" means that "no reasonable litigant could realistically expect success on the merits." *PRE,* 508 U.S. at 60, 113 S.Ct. 1920. However, "[i]f an objective litigant could conclude that the suit is reasonably calculated to elicit a favorable outcome, the suit is immunized under *Noerr,* and an antitrust claim premised on the sham exception must fail." *Id.* Moreover, legally reasonable litigation, as an objective matter, precludes any further inquiry into the economic circumstances or motivation of the antitrust defendant in bringing the underlying infringement suit, and the subjective element of the *PRE* test is never reached. *See id.* at 60, 65–66, 113 S.Ct. 1920 (approving of summary judgment in just such a case). In

---

3. Although *PRE* was a copyright case, the Supreme Court seemed to generalize its discussion to cover all "sham" litigation, *see PRE,* 508 U.S. at 60, 113 S.Ct. 1920, such that the requirements discussed in *PRE* apply to a patent infringement case as well. *See, e.g., FilmTec Corp. v. Hydranautics,* 67 F.3d 931, 937 (Fed.Cir.1995) (applying the *PRE* test to a patent infringement case).

short, the antitrust-plaintiff must "disprove the challenged lawsuit's legal viability." [4] *Id.* at 61, 113 S.Ct. 1920.

The question of the infringement suit's legal viability is a question of law. *Id.* at 63, 113 S.Ct. 1920; *FilmTec Corp. v. Hydranautics*, 67 F.3d 931, 938 (Fed.Cir.1995). Therefore, if Europa is unable to show that the patent infringement suit was baseless, its anti-trust claim against Master Design is appropriately dismissed as a matter of law. *See Carroll Touch, Inc. v. Electro Mechanical Sys., Inc.*, 15 F.3d 1573, 1583 (Fed.Cir. 1993) (upholding a district court's granting of summary judgment on the question of whether an infringement action was objectively reasonable under the *PRE* test). To prevail, an antitrust plaintiff must show by clear and convincing evidence that the infringement suit is a sham. *Handgards, Inc. v. Ethicon, Inc.*, 601 F.2d 986, 996 (9th Cir.1979); *Mitek Surgical Products, Inc. v. Arthrex, Inc.*, 21 F.Supp.2d 1309, 1317–18, 1998 WL 678128, at *9 (D.Utah Sept. 21, 1998). Such a standard "accords the patentee a presumption commensurate with the statutory presumption of patent validity set forth in the patent laws." *Handgards, Inc.*, 601 F.2d at 996.

Europa argues that Master Design's infringement suit was found to be unreasonable when this Court entered summary judgment dismissing Master Design's infringement claim, (*See* Def. Rev. Trial Br. [Doc. # 68], at 13.) However, *PRE* cautions that a case should not be assumed to be legally unreasonable simply because the plaintiff lost:

> a court must 'resist the understandable temptation to engage in post hoc reasoning by concluding' that an ultimately unsuccessful 'action must have been unreasonable or without foundation.' [Cit.] The court must remember that '[e]ven when the law or the facts appear questionable or unfavorable at the outset, a party may

have an entirely reasonable ground for bringing suit.'

*PRE*, 508 U.S. at 60 n. 5, 113 S.Ct. 1920 (quoting *Christiansburg Garment Co. v. EEOC*, 434 U.S. 412, 421–422, 98 S.Ct. 694, 54 L.Ed.2d 648 (1978)). Since *PRE*, several courts have held that patent infringement suits were still legally reasonable suits to bring, even though the suits were eventually decided against the patentees. *See, e.g., FilmTec Corp.*, 67 F.3d at 937–38 (holding that an unsuccessful patent infringement suit was not objectively baseless, and that the outcome of the infringement suit "although instructive, is not determinative" because "the Supreme Court has forbidden us to equate loss on the merits with objective unreasonableness"); *Carroll Touch, Inc.*, 15 F.3d at 1583; *Mitek Surgical Products, Inc.*, 21 F.Supp.2d 1309, 1317–18.

(b).

Summary judgment was entered against Master Design in the patent infringement suit because it was determined that amendments Master Design made during the prosecution of the '045 patent (1) precluded Master Design from arguing that Europa "literally infringed" the '045 patent, and (2) estopped Master Design from arguing that the '045 patent was infringed under the doctrine of equivalents. (*See* Mem. Op. [Doc. # 58].) While some language in this Court's August 3, 1998 Memorandum Opinion does seem to support Europa's point of view that the litigation was objectively unreasonable ("[t]he prosecution history of Master Design's patent is susceptible to only one reasonable interpretation...." (Mem. Opinion [Doc. # 58], at 4)), that language reflected, in part, this Court's reading of *Warner–Jenkinson Co. v. Hilton Davis Chemical Co.*, 520 U.S. 17, 117 S.Ct. 1040, 137 L.Ed.2d 146 (1997), a case decided after Master Design had filed the instant patent claim. [5]

4. The law of the Federal Circuit will control the question of whether conduct in enforcing a patent infringement suit is sufficient to strip a patentee of its immunity from antitrust laws. *Nobelpharma AB v. Implant Innovations, Inc.*, 141 F.3d 1059, 1068 (Fed.Cir.1998). However, in the instant case, the law of the Fourth Circuit will still

control the resolution of issues involving other elements of antitrust law, such as relevant market. *See id.*

5. The Supreme Court, in *Warner–Jenkinson*, reaffirmed the vitality of the doctrine of equivalents; however, it also held that amendments made

At the time this suit was brought, in January 1997, an objectively reasonable litigant could believe that Europa's glass-topped table infringed the '045 patent under the doctrine of equivalents. The doctrine of equivalents is an equitable doctrine designed for cases where there is no literal infringement, but liability is appropriate to prevent what is in essence a pirating of a patent. *See Texas Instruments, Inc. v. United States Int'l Trade Comm'n,* 988 F.2d 1165, 1173 (Fed. Cir.1993). In pre-*Warner–Jenkinson* cases, the *Gorham* test of similarity of ornamental appearance has been used to determine equivalence. *See, e.g., Lee v. Dayton–Hudson Corp.,* 838 F.2d 1186, 1190 (Fed.Cir.1988) (citing *Gorham Mfg. Co. v. White,* 81 U.S. (14 Wall) 511, 20 L.Ed. 731 (1871)). In the instant case, under the *Gorham* test, an objective litigant could assume that table tops are functional, and that the true "ornamental feature" of the '045 design patent is the leg and apron design seen in all of the final embodiments.[6] Therefore, a reasonable litigant could have determined that its prospects of success were favorable, because the leg and apron design on the Master Design tables was similar to the leg and apron design on the allegedly-infringing tables made by Europa.[7] Moreover, the pre-*Warner–Jenkinson* application of prosecution history estoppel was sufficiently ambiguous regarding the types of amendments made in this case, that the patentee could argue reasonably that the estoppel would not apply.

### (c).

At the time of the suit, the interplay between the doctrine of equivalents and prosecution history estoppel (or "file wrapper es-

toppel") was unclear. *See* Glenn K. Beaton, *File Wrapper Estoppel and the Federal Circuit,* 68 Denv. U.L. Rev 283, 284 (1991) ("The law of file wrapper estoppel is unpredictable."). Prosecution history estoppel serves as a limit on the doctrine of equivalents, Robert L. Harmon, *Patents and the Federal Circuit* § 6.3(b), at 232 (3d ed.1994), because claim amendments and arguments made during the prosecution of a patent may preclude a patentee from recapturing subject matter relinquished during prosecution of a patent. *Texas Instruments, Inc.,* 988 F.2d at 1173.

A court's application of the estoppel was "guided by equitable and public policy principles underlying the doctrines involved and by the facts of the particular case." *Loctite Corp. v. Ultraseal Ltd.,* 781 F.2d 861, 871 n. 7 (Fed.Cir.1985) *overruled on other grounds by Nobelpharma AB v. Implant Innovations, Inc.,* 141 F.3d 1059, 1068 (Fed.Cir.1998). This case-by-case analysis made the doctrine's application difficult to predict at times. The most encompassing statement one could make regarding prosecution history estoppel was that not every type of amendment made during the prosecution of a patent would create an estoppel. Otherwise, the estoppel doctrine would "negat[e] entirely the doctrine of equivalents and limit[ ] determination of the infringement issue to consideration of literal infringement alone." *Hughes Aircraft Co. v. United States,* 717 F.2d 1351, 1362 (Fed.Cir.1983). Indeed,

> [a]mendment of claims is a common practice in prosecution of patent applications. No reason or warrant exists for limiting application of the doctrine of equivalents to those comparatively few claims allowed ex-

---

during the prosecution of a patent should be presumed to be "related to patentability" if no other reason can be shown for the amendment. The holding thereby expanded the effect that prosecution history estoppel has on the doctrine of equivalents. *See Warner–Jenkinson,* 520 U.S. at ——, 117 S.Ct. at 1051; *see also* discussion *infra* Part IV(d).

**6.** Indeed, Master Design consistently has asserted that it was this leg and apron design—and not the type of table top—that was the inventive concept behind its patent application. *(See* Def. Ans. [Doc. # 5], at Ex.A, File Wrapper, Resp, Paper No. 4 and Supplemental Information Disclosure Statement, at 2.)

**7.** This question regarding the doctrine of equivalents was never reached by the summary judgment opinion in the instant case, because it was determined that prosecution history estoppel precluded Master Design from arguing infringement under the doctrine of equivalents. Moreover, it would not be proper to speculate on a possible outcome under the doctrine of equivalents. Yet, it is safe to say that, under the *Gorham* test, an objective litigant in Master Design's position would not be unreasonable in believing that it had a *legitimate chance of success* in an infringement suit based on the doctrine of equivalents.

actly as originally filed and never amended. Amendments may be of different types and may serve different functions. Depending on the nature and purpose of an amendment, it may have a limiting effect within a spectrum ranging from great to small to zero.

*Id.* A leading treatise on patent law came to no more certain a conclusion on the scenarios in which file wrapper estoppel would be applied: "There is no mechanical rule for determining prosecution history estoppel's effect on the range of equivalents." Harmon, *supra*, § 6.3(b), at 237. The ultimate question for determining whether an estoppel occurs because of an amendment during the prosecution of a patent was whether the amendment was related to the patentability of the design; if so, then the patentee may be estopped from relying on the doctrine of equivalents when enforcing its patent. *Texas Instruments, Inc.*, 988 F.2d at 1174.

Given such a nebulous doctrine, determining exactly when an estoppel is created was a difficult question for courts, and, subsequently, for prospective litigants. The typical case in which prosecution history estoppel was applied involved amendments in which the applicant narrowed the patent in response to a rejection based on prior art. *See, e.g., Pall Corp. v. Micron Separations, Inc.*, 66 F.3d 1211, 1219 (Fed.Cir.1995) ("Prosecution history estoppel normally arises when a change of claim scope is made in order to overcome an examiner's rejection based on prior art."). Although the amendments made in the prosecution of the '045 patent were not in response to a rejection based on prior art, *see* discussion *infra*, a reasonable litigant would be required to make further inquiry because "[a]mendment of a claim in light of a prior art reference ... is not the *sine qua non* to establish prosecution history estoppel." *Texas Instruments, Inc.*, 988 F.2d at 1174, "Unmistakable assertions made by the applicant to the Patent and Trademark Office (PTO) in support of patentability, whether or not required to secure allowance of the claim, also may operate to preclude the patentee from asserting equivalency between a limitation of the claim and a substituted structure or process step." *Id.*

Therefore, the discreet reasons for the amendments of the '045 patent must be analyzed to determine the objective reasonableness of a patent infringement claim.

### (d).

The amendments made during the prosecution of the '045 patent were in response to (1) a restriction requirement under 35 U.S.C. § 121,[8] and (2) two rejections for indefiniteness under 35 U.S.C. § 112.[9]

The PTO required restrictions on the '045 patent pursuant to § 121 because the application contained several, patentably-distinct embodiments. (File Wrapper, Paper No. 4, at 2.)[10] Master Design responded to this requirement by selecting one group of embodiments for further consideration. (File Wrapper, Resp. Paper No. 4 and Supplemental Information Disclosure Statement, at 2.) However, Master Design did not agree with the PTO, because Master Design traversed the restriction requirement. (*Id.* at 1.) Master Design argued that (1) the "leg and apron design," which appeared in every embodiment, was the common inventive concept of the application, and (2) the fact that some embodiments had tops of glass, while some had tops of parquet design, did not distinguish the embodiments. (*Id.* at 1–2.) The

---

**8.** The pertinent part of § 121 reads: "If two or more independent and distinct inventions are claimed in one application, the Commissioner may require the application to be restricted to one of the inventions." 35 U.S.C. § 121.

**9.** The first rejection was pursuant to the second paragraph of § 112, which reads: "The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention." 35 U.S.C. § 112(2). The second rejection was pursuant to the first paragraph of § 112, as well as the second paragraph. The

first paragraph provides: "The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor of carrying out his invention." 35 U.S.C. § 112(1).

**10.** The complete File Wrapper is contained in Defendant's Answer [Doc. # 5], Ex. A.

PTO noted Master Design's traversal; however, the PTO responded that the tables in the original application had other variances, from different top configurations to the addition of a shelf. These variances gave the tables patentably-distinguishable visual appearances. (File Wrapper, Paper No. 6, at 2.)

The claim for the '045 patent was also rejected twice under § 112. The first § 112 rejection was for indefiniteness under § 112's second paragraph, because the drawings that were resubmitted to the PTO were, according to the PTO, "mutually inconsistent and sketchily depicted." (Id.) In response, Master Design prepared new drawings, which included depictions of tables with both glass-tops and parquet-tops. (File Wrapper, Amendment in Resp. to Paper No. 6.) This amended claim was rejected as well, under both the first and second paragraphs of § 112. (File Wrapper, Paper No. 8, at 2.) The claim was rejected under the first paragraph of § 112 because it introduced new matter—i.e. differences existed between the original and new drawings—and therefore the claim did not satisfy the description requirement of § 112(1). (Id.) The claim was rejected under the second paragraph of § 112 as being indefinite for failing to particularly point out and distinctly claim the subject matter regarded as the invention. (Id.) Moreover, the PTO reemphasized its original § 121 restriction by requiring the removal of two embodiments that were restricted out of the application. (Id.) The two embodiments had glass tops. In its final response, Master Design withdrew these glass-topped embodiments, stating that the new drawings "properly include the parquet appearance of the top, as opposed to the glass top drawings submitted earlier." (File Wrapper, Response Paper No. 8, at 1.) The examiner then granted Master Design a Notice of Allowability. (File Wrapper, Notice of Allowability, Paper No. 10.)

For the reasons discussed below, when Master Design initiated this infringement suit in January 1997, a reasonable litigant could make a valid argument that amendments made in response to restrictions under § 121 and rejections under § 112 would not necessarily estop a patentee from asserting infringement under the doctrine of equivalents.

First, an objective litigant could rely on language from various case law to support a belief that, because the amendments were made in response to either a § 121 restriction or a § 112 indefiniteness rejection, prosecution history estoppel may not apply. In Bayer Aktiengesellschaft v. Duphar Intern. Research B.V., 738 F.2d 1237 (Fed.Cir.1984), for example, the court overturned a magistrate judge's award of attorneys' fees, because the award was based on the judge's misunderstanding of file wrapper estoppel law. Id. at 1244. The magistrate judge had concluded that the patentee's infringement lawsuit was frivolous because the patentee had made amendments in response to a § 121 rejection that allegedly precluded the patentee's infringement argument. Id. at 1241–42. The Federal Circuit, however, in overturning the decision, emphasized that "limiting the claims because of a restriction requirement ... would not necessarily invoke file history estoppel." Id. at 1243.[11] The decision specifically did not determine the extent of a potential estoppel in cases involving § 121 restrictions. Id. at 1242 n. 11.

Moreover, Master Design argued that because the § 121 restriction was an "administrative requirement," it was not related to patentability, and therefore should not lead to estoppel. (See Master Design's Trial Br. [Doc. # 66], at 10.) A reasonable patentee-litigant similarly could examine case law existent at the time of the suit and plausibly conclude that a restriction requirement under § 121 related only to the PTO's case management and its control of filing and search fees—and that it did not relate to patentability. See R2 Medical Systems, Inc. v. Katecho, Inc., 931 F.Supp. 1397, 1438 (N.D.Ill.1996) ("[T]here is some question

11. Prior to the appellate court's opinion, but after the magistrate judge's decision in Bayer, it was ruled that the PTO could only restrict—and not reject—an application based on § 121. See Application of Weber, 580 F.2d 455, 458 (C.C.P.A. 1978). This change in policy explains the Federal Circuit's use of the term "restriction" in a case originally involving a § 121 rejection.

whether an applicant's response to a restriction [under § 121] has the same preclusive effect as a response to a rejection."); *cf. Application of Weber* (C.C.P.A.1978) (requiring the PTO to restrict, rather than to reject, a claim based on § 121). Indeed, other litigants have examined these same cases and made arguments similar to those proffered by Master Design. *See Merck & Co. v. Mylan Pharm., Inc.*, 19 F.Supp.2d 334, 348–50 (E.D.Pa. Aug. 24, 1998) (considering patentee's argument that estoppel did not apply because the amendment was made in response to a § 121 restriction, but ultimately applying prosecution history estoppel because the court determined that a patentee's amendments were made in response to a prior art objection under § 103; therefore the court did not reach the § 121 issue). The fact that this Court in the instant case did not agree with the proponents of this § 121 argument does not mean that the argument itself is baseless.

A reasonable litigant could argue that the rejections under § 112 did not necessarily result in an estoppel either. *See Pall Corp.*, 66 F.3d at 1219–20 ("Whether amendment or argument made in response to a rejection under § 112 produces an estoppel, as does an amendment made to obtain allowance in view of cited references, is dependent on the particular facts."). A prospective litigant could examine case law and find reasonable support for the argument that the § 112 rejection in the instant case did not relate to patentability. *See, e.g., Mannesmann Demag Corp. v. Engineered Metal Prod.*, 793 F.2d 1279, 1285 (Fed.Cir.1986) ("[E]stoppel is not necessarily created by an amendment designed only to remove a § 112 indefiniteness rejection."); *Caterpillar Tractor Co. v. Berco, S.P.A.*, 714 F.2d 1110, 1115 (Fed.Cir. 1983) (refusing to find prosecution history estoppel where the rejection was based on § 112 indefiniteness, because prior art did not dictate the limitation at issue). As the Federal Circuit stated recently, "[t]here is no all-encompassing rule that estoppel results from all claim changes, or all arguments, whatever their cause or purpose." *Pall Corp.*, 66 F.3d at 1220 (citing cases in which estoppel did not result based on rejections under § 112). Ultimately, it is clear that

"[t]he fact that claims were narrowed does not always mean that the doctrine of file history estoppel completely prohibits a patentee from recapturing some of what was originally claimed." *Bayer Aktiengesellschaft*, 738 F.2d at 1243.

Second, Master Design relied upon *Arner v. Sharper Image Corp.*, 39 U.S.P.Q.2d 1282, 1995 WL 873730 (C.D.Cal.1995) for the proposition that the scope of the design patent was not limited by a restriction requirement of the PTO. (*See* Pl.'s Opp'n Def.'s Mot. Partial Summ. J. on the Issue of Non–Infringement [Doc. # 13], at 8–9.) In *Arner*, the defendant in a patent infringement suit argued that its product was even more different from the patented product than a variation that the patentee had surrendered in response to a restriction requirement during prosecution. *See Arner*, 39 U.S.P.Q.2d 1282, 1995 WL 873730, at *11. The *Arner* court determined that such prosecution history evidence had no bearing on the *scope* of the patent at issue. *See id.* at *12. The *Arner* decision was not relied upon in the issuance of summary judgment against Master Design because the *Arner* court did not sufficiently explain its reasoning for ignoring certain prosecution history evidence, nor did it cite any authority for why the defendant's argument was incorrect. (*See* Mem. Op. [Doc. # 58], at 7.) Although this Court chose not to follow its sister district court, a litigant-patentee could have reasonably relied upon *Arner*'s authority in order to advance similar arguments in the initiation of an infringement suit.

Third, as discussed *supra*, because of the nebulous standard for estoppel that existed at the time of the suit, it would have been very difficult for a prospective litigant-patentee to forecast whether a court would determine an amendment to be "related to patentability." *Cf. Warner–Jenkinson Co., Inc. v. Hilton Davis Chemical Co.*, 520 U.S. 17, ——, 117 S.Ct. 1040, 1055, 137 L.Ed.2d 146 (1997) (Ginsburg, J., concurring) (noting that prior to the *Warner–Jenkinson* opinion, there was an "absence of clear rules of the game"). Even though amendments based on prior art arguably are still the easiest cases for applying estoppel, courts today regularly debate

whether an amendment fits within the "prior art" category. *See, e.g., EMI Group North America, Inc. v. Intel Corp.,* 157 F.3d 887 (Fed.Cir.1998) (debating whether an amendment was in response to prior art for the purposes of prosecution history estoppel); *Phillips Petroleum Co. v. Huntsman Polymers Corp.,* 157 F.3d 866 (Fed.Cir.1998) (same). At the time the instant suit was filed, it could be even more difficult for a litigant to predict the potential for estoppel based on amendments other than those in response to prior art rejections, such as in this case. Whether estoppel would apply was, at times, a question about which reasonable minds might differ, and it was reasonable for a patentee confronted with such a question to look to the judicial system to interpret the legal meaning of an amendment during the patent process.

In partial response to this interpretive difficulty, the Supreme Court recently held that courts should presume that an amendment relates to patentability (and therefore estoppel should apply), absent some appropriate reason provided by the patentee. *See Warner–Jenkinson,* 520 U.S. at ——, 117 S.Ct. at 1051. While the Supreme Court's opinion in *Warner–Jenkinson* played a prominent role in the Summary Judgment Opinion that dismissed Master Design's patent infringement suit (*see* Mem. Op. [Doc. # 58], at 8–10), *Warner–Jenkinson* had not been decided at the time Master Design initiated its lawsuit. Therefore, Master Design did not have knowledge that any such presumption could be used against it, and holding it to that standard *ex post* would not serve the interests of either patent law or antitrust law. Justice Ginsburg, in a concurrence to *Warner–Jenkinson,* noted that "[t]he new presumption, if applied woodenly, might in some instances unfairly discount the expectations of a patentee who had no notice at the time of patent prosecution that such a presumption would apply." *Warner–Jenkinson,* 520

U.S. at ——, 117 S.Ct. at 1055 (Ginsburg, J., concurring). This Court used a similar perspective in determining that Master Design's lawsuit was objectively reasonable.

It should be noted that this opinion should not be read to say that all infringement suits based on patents with amendments made in response to a § 112 rejection or a § 121 restriction are objectively reasonable. Nor does this opinion hold that the prosecution history estoppel doctrine is so confused that any patentee would be reasonable in bringing a lawsuit, regardless of the existence of amendments during the prosecution of the patent that relate to the patentability of the claim.[12] Rather, the holding in this case is that at the time this infringement litigation was filed, an objective litigant could have examined the prosecution history of the '045 patent and expected a reasonable chance of success. All that is required for objective reasonableness is a reasonable belief that there is a chance that a claim may be held valid upon adjudication. *PRE,* 508 U.S. at 62–63, 113 S.Ct. 1920.

## V.

Proving a relevant market is a "threshold" requirement for a Sherman Act § 2 claim. *Consul, Ltd. v. Transco Energy Co.,* 805 F.2d 490, 493 (4th Cir.1986). Antitrust plaintiffs must establish the relevant market, consisting of a geographic and a product market, that was monopolized in order to move forward with their claim. *Id.* To determine the relevant antitrust market, a court needs to examine the ability of consumers to substitute other products for the allegedly monopolized product. As the Supreme Court stated in *United States v. E.I. duPont de Nemours & Co.,* 351 U.S. 377, 76 S.Ct. 994, 100 L.Ed. 1264 (1956), the relevant market "is composed of products that have reasonable interchangeability for the purposes for which they are produced—price, use and

---

12. Given the *Warner–Jenkinson* presumption that all amendments relate to patentability, this question should arise less frequently in the future. Yet, even before *Warner–Jenkinson,* if the amendment clearly was made in response to an obviousness objection under § 103, for example, prosecution history estoppel would apply. *See*

*Texas Instruments, Inc.,* 988 F.2d at 1174 ("As a general proposition, prosecution history estoppel is based upon a showing that an applicant amended a claim to avoid a cited prior art reference."). In the face of such a clear amendment, an infringement suit certainly could be objectively baseless.

qualities considered." *Id.* at 404, 76 S.Ct. 994; *see also Seabury Management, Inc. v. Professional Golfers' Ass'n, of America, Inc.,* 52 F.3d 322, 1995 WL 241379, at *3 (4th Cir.1995) (unpublished disposition) (stating that the "key to defining the relevant market is the interchangeability of products").

Judge Gordon expounded on the *du Pont* definition in *Satellite Television & Associated Resources, Inc. v. Continental Cablevision of Va., Inc.,* 714 F.2d 351 (4th Cir.1983):

One may attempt to clarify this definition with more precise economic terms by stating that the outer boundary of the relevant product market is reached, if one were to raise the price of the product or limit its volume of production, while demand held constant, and supply from other sources beyond the boundary could not be expected to enter promptly enough and in large enough quantities to restore the old price or volume. A "relevant market," then, is the narrowest market which is wide enough so that products from adjacent areas or from other producers in the same area cannot compete on substantial parity with those included in the market.

*Id.* at 357 (citations omitted); *see also International Wood Processors v. Power Dry, Inc.,* 792 F.2d 416, 430 (4th Cir.1986) (citing identical language).

In a similar formula to the one advocated by Judge Gordon, the leading antitrust treatise has defined the relevant market as such: "[a] product grouping constitutes a market if a hypothetical defendant controlling its output could maximize profits by charging significantly more than the competitive price for a significant period." Areeda, Hovenkamp, & Solow, *Antitrust Law,* ¶ 560, at 251 (1995 rev. ed.). Areeda, Hovenkamp, and Solow describe the following methodology for defining the market:

Begin by characterizing product A as a "provisional market." Then ask whether a "significant" price increase by a hypothetical A monopolist—assuming everything else remains constant—would maximize its profits. If so, A is the market. If not, the reason is presumably too many shifts to or by the B firms. Therefore, we then ask whether a hypothetical monopolist controlling all the output of both A and B could profit from a significant price increase. If so, the market includes both A and B. If not, the provisional market is broadened further to include the next best substitute until we identify that group of firms that could profit from a significant price increase. The market is the smallest grouping that satisfies this test.

*Id.* ¶ 536, at 196. This methodology requires at least four steps: (1) resolving what goes into the initial provisional market A; (2) defining the magnitude of a "significant" price increase; (3) assessing the likely reactions of A customers and B firms; and (4) avoiding the overly broad market definition that would result when current A prices are already supracompetitive. *Id.* at 197.

 "The geographic market should consist of an area *in which the defendants operate and which the plaintiff can reasonably turn to for supplies.*" *RCM Supply Co. v. Hunter Douglas, Inc.,* 686 F.2d 1074, 1077 (4th Cir.1982). Moreover, "the relevant geographic market is the area in which buyers or sellers of the relevant product effectively compete." *Consul, Ltd.,* 805 F.2d at 495. There is not a dispute in the instant case that the geographic market involves the entire United States.

 The relevant product market can be defined by "the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it." *Brown Shoe Co. v. United States,* 370 U.S. 294, 325, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962). Practical indicia of the boundaries of the product market may also be examined, such as "industry public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors." *Id.* at 325, 82 S.Ct. 1502.

 Although Europa defined its proposed relevant product market inconsistently throughout this litigation, it was recently determined that the proposed relevant market for the case would be "casual contemporary wooded occasional tables for sale within the

United States." (*See* Memo. Order [Doc. # 75], at 5.) Europa then was provided the opportunity to forecast the evidence upon which it would rely to establish that such a relevant market existed. (*See* Order [Doc. # 76], at 1.) However, despite a lengthy hearing and the submission of more evidence by Europa, (*see* Evidence Submitted Supp. Def.'s Antitrust Counterclaim [Doc. # 80]), Europa has failed to forecast sufficient evidence—measured either quantitatively or qualitatively—to reach a jury on the question of whether a relevant market existed.

The tests described above require a basic level of comparative analysis of the substitutability of various products among consumers, which Europa simply did not provide. Using the Areeda, Hovenkamp, and Solow methodology, for example, Europa did not ever address the possible effects on the proposed relevant market if a hypothetical monopolist initiated a "significant" price increase. Would the monopolist be able to maximize its profits, or would other firms be able to shift their productions to prevent such maximization by one firm? What would the likely reactions of consumers be? Would they substitute other products to avoid the price increase? For example, was Master Design so positioned within the "casual contemporary wooded occasional tables for sale within the United States" market, that it would have had the power to raise prices to a supracompetitive level without some other company providing an acceptable lower cost alternative (easy entry) or consumers buying some other type of table (cross-elasticity)? If Master Design had raised the prices to supracompetitive levels, would consumers have chosen another type of table (either formal, or classical, or non-wooden, or non-occasional)? Europa was unable to provide the answers to such essential questions.

Rather, Europa relied upon relatively innocuous statements from the deposition of its own president, and from the deposition statements made by a former president of Victus, Ltd., d/b/a Master Design, Mr. Ronald Hahn. For example, at one point Mr. Hahn stated that "niches" exist in the market for wooden tables that are "discreet area[s] of sales"; and one such niche was casual contemporary wooded occasional tables. (*See* Evidence Submitted Supp. Def.'s Antitrust Counterclaim [Doc. # 80], Ex.6, at 50.) Such statements, without more, do not provide a sufficiently nuanced analysis of such a difficult economic question.

Europa also argued that the manner in which occasional tables are allegedly bought supports its assertion that a relevant market of casual contemporary wooded occasional tables exists. At the hearing on September 25, 1998, Europa contended that such tables are bought only after the more expensive items in a living room set are purchased.[13] The style of occasional table that is selected, then, is determined by the other pieces of furniture purchased first, such as a sofa and chair. Therefore, the casual contemporary wooded occasional tables were a "relevant market," according to Europa, because consumers would not substitute another type of table—such as traditional occasional table or a casual, contemporary glass table—if only the casual contemporary wooded table matched their furniture's style. As Mr. Frankel stated, "[s]tyles of occasional tables which would be attractive to a consumer ... are not determined by mere attractiveness of the product in and of itself. Rather, occasional tables are purchased to accent, match, or accessorize the upholstered goods chosen by the consumer." (*See id.* Ex. 1, at 4.) In support of this notion, Europa also proffered marketing information from Master Design that divided Master Design's line of tables into various styles, with casual contemporary wooded tables being a distinct style. (*See id.* Ex.5.)

Such evidence is not sufficient because it does not address any of the concerns mentioned above. Moreover, Mr. Frankel's affidavit relies only upon his experience in the industry and does not provide solid statistical evidence of the type normally associated with antitrust cases. Testimony from an economist is not necessary; however, some evi-

---

13. This assertion was supported in the record by a Supplemental Affidavit from Leonard H. Frankel, the president of Europa, which was submitted with other evidence at the hearing. (*See* Evidence Submitted Supp. Def.'s Antitrust Counterclaim [Doc. # 80], Ex. 1.)

dence of the effects of price increases on the proposed market, and an analysis of consumer reactions to such a scenario, would make Europa's argument more plausible. Specifically, what would a consumer do if the price of the wooded occasional tables increased? Europa has not forecast any evidence that would specifically address this essential question. Economic experts may not be required, but Europa has not provided affidavits of any witnesses who can address such questions, even if their opinions are based solely on their experience in the industry.[14] No reasonable jury could find that a relevant market, as described by Europa, exists; therefore, summary judgment must be entered against Europa.

## VI.

Finally, Europa has moved for attorneys' fees and expenses relating to its defense against Master Design's infringement suit, pursuant to 35 U.S.C. § 285. (Defendant. Mot. Atty's Fees & Expenses [Doc. # 61].) Section 285 provides that in patent cases, "[t]he court in exceptional cases may award reasonable attorney fees to the prevailing party." The purpose of the statute is to allow the district court discretion to award fees "where it would be *grossly unjust* that the winner be left to bear the burden of his own counsel which prevailing litigants normally bear." *Badalamenti v. Dunham's, Inc.*, 896 F.2d 1359, 1364 (Fed.Cir.1990) (quoting *J.P. Stevens Co., Inc. v. Lex Tex Ltd.*, 822 F.2d 1047, 1052 (Fed.Cir.1987)) (internal quotation marks omitted). Congress intended that district courts use this discretion sparingly, as the statute is a departure from the usual "American" rule that counsel fees are not awarded to the prevailing party in an action at law. *DuBuit v. Harwell Enters., Inc.*, 540 F.2d 690, 694 (4th Cir. 1976). Therefore, an award of fees is proper only where there is "some finding of unfair-

ness, bad faith, or inequitable conduct on the part of the unsuccessful patentee." *Badalamenti*, 896 F.2d at 1364 (quoting *Stevenson v. Sears, Roebuck & Co.*, 713 F.2d 705, 713 (Fed.Cir.1983)) (internal quotation marks omitted).

A claim under Section 285 requires a two-step inquiry. First, the movant must present clear and convincing evidence that the case is "exceptional." *Interspiro USA, Inc. v. Figgie Int'l Inc.*, 18 F.3d 927, 933 (Fed.Cir.1994). Second, if the case is deemed exceptional, then the trial court must determine whether an award of attorney fees is warranted. *Id.*

A case can be deemed "exceptional" if, among other things, an opposing party's conduct involved "willful infringement, inequitable conduct before the Patent and Trademark Office, misconduct during litigation, vexatious or unjustified litigation, and frivolous suit." *Beckman Instruments, Inc. v. LKB Produkter AB*, 892 F.2d 1547, 1551 (Fed.Cir.1989); *see also Bayer Aktiengesellschaft v. Duphar Intern. Research B.V.*, 738 F.2d 1237, 1242 (Fed.Cir.1984). Additionally, a court will examine "the closeness of the case" to determine if a case is exceptional. *Afros S.p.A. v. Krauss–Maffei Corp.*, 671 F.Supp. 1402, 1440 (D.Del.1987). In short, the successful patent defendant must demonstrate evidence of either wrongful intent or of gross negligence on the part of the plaintiff in bringing the action. *Machinery Corp. of Am. v. Gullfiber AB*, 774 F.2d 467, 473 (Fed.Cir.1985).

This case does not present circumstances that approach such egregious conduct on the part of Plaintiff Master Design. First, Europa has not attempted to show that Master Design engaged in any inequitable conduct before the Patent and Trademark Office. Second, as discussed above, the pat-

---

14. In fact, some of Europa's own evidence seems to undermine its theory of the relevant market. The product information from Master Design seems not only to divide up the occasional table market into "niches," as argued by Europa, but it also divides up the niches according to price ranges. Moreover, Mr. Frankel's affidavit suggests that the price of an occasional table is as important to the consumer as the style. (*See*

Master Design's Supplementation of Record [Doc. # 81], Affidavit of Leonard Frankel, at 246–251.) Furniture makers attempt to produce tables at each "price point," in order to fill out a "complete line" of tables. *Id.* This evidence suggests that the real market is determined by price points, and not by specific types of tables—a factual matter about which Europa offered no evidence.

ent infringement case was objectively reasonable despite the fact that it was unsuccessful. *See supra* Part IV. The finding of objective reasonableness seems to preclude any finding of gross negligence in bringing the action, of vexatious or unjustified litigation, or of a frivolous suit. *Cf. TVI Energy Corp. v. Blane,* 806 F.2d 1057, 1061 (Fed.Cir.1986) (refusing to award attorneys' fees where the plaintiff raised a "colorable, albeit weak, argument that was not raised in bad faith"). However, unlike the discussion in Part IV regarding the *PRE* standard, a finding of objective reasonableness does *not* preclude a discussion of "bad faith" or "wrongful intent" under a § 285 analysis. Attorneys' fees and expenses may be awarded if Europa could show by clear and convincing evidence that Master Design pursued the patent infringement case in bad faith or with wrongful intent, even though the case was objectively reasonable to bring.

Such a showing may be roughly equivalent to the situation described in Justice Stevens' concurrence to *PRE,* in which a patentee's lawsuit could still be a "sham," even if an objective litigant could reasonably expect success on the merits, because the patentee is indifferent to the outcome of the litigation. *Cf. PRE,* 508 U.S. 49, 68–69, 72–76, 113 S.Ct. 1920, 123 L.Ed.2d 611 (1993) (Stevens, J., concurring). Specifically, Justice Stevens was concerned about a patentee that initiates a "reasonable" lawsuit with the malicious intent to impose collateral harm on the defendant. *Id.* Justice Stevens quoted Judge Posner's description of a situation in which a monopolist brings a suit that had a colorable basis in law; but "the monopolist never would have brought the suit—its chances of winning, or the damages it could hope to get if it did win, were too small compared to what it would have to spend on the litigation—except that it ... wanted to impose heavy legal costs on the competitor in the hope of deterring entry by other firms." *Id.* at 73–74, 113 S.Ct. 1920 (quoting *Grip–Pak, Inc. v. Illinois Tool Works, Inc.,* 694 F.2d 466, 472 (7th Cir.1982)) (internal quotation marks omitted).

The instant case, however, is not such a case. Europa has not offered evidence to support a finding by clear and convincing standards that Master Design brought this suit in an attempt to do anything other than secure its rights under the patent laws. Europa points to statements made by Master Design's counsel to the press when the litigation began as evidence of Master Design's "attempt to intimidate" Europa. (Def. Memo. Law Support Mot. Atty's Fees & Expenses [Doc. # 62], at 12.) However, Master Design's comments seem to be nothing more than typical attorney posturing, and the statements themselves say little more than what was alleged in Master Design's original complaint.

Europa also charges that Master Design originally filed the infringement lawsuit, along with other claims, but then withdrew the suit without serving Europa. Additionally, Europa points to the fact that Master Design, upon refiling the case, withdrew two claims in order to avoid Europa's insurance policy coverage for the litigation. Europa also alleges various discovery abuses, including delaying significant discovery until after settlement negotiations broke down. While this evidence without explanation may raise a slight inference of bad faith, they are also explainable as a means for Master Design to reach a settlement in the case expediently. If Master Design wanted to avoid litigation costs, yet still enforce its patent under a plausible interpretation of the patent's coverage, such tactics may be appropriate. Europa certainly has not shown otherwise.

As final evidence of bad faith, Europa points to a letter written by Master Design's counsel to the President of Master Design after the § 121 restriction requirement was affirmed by the PTO examiner. In the letter, Howard MacCord recommends that Master Design file divisional applications to obtain "full coverage" of the embodiments restricted out of the patent application by the § 121 restriction. (*See* Evidence Submitted Supp. Def.'s Antitrust Counterclaim [Doc. # 80], at Ex.9.) Rather than show that Master Design knew its patent did not cover the restricted embodiments (including the glass top table at the center of this dispute), this letter can be read with equal plausibility as a lawyer attempting to reduce his client's expo-

sure, an exhortation to replace an inexactly contoured implicit protection with explicit protection. The fact that a party believes it does not have "full" coverage, does not mean that the party believes it does not have *any* coverage under the patent laws.

Europa has failed to provide sufficient evidence that Master Design pursued its patent infringement claim without a reasonable belief in the merits. *See Carroll Touch, Inc. v. Electro Mechanical Systems, Inc.*, 15 F.3d 1573, 1584 (Fed.Cir.1993). The few factual circumstances to which the Defendant points in order to show "vexatious or unjustified litigation, or a frivolous suit" or "bad faith" litigation clearly do not rise to the "clear and convincing evidence" standard required by Section 285.

### VII.

For the foregoing reasons, summary judgment on the Defendant's antitrust counterclaim is GRANTED in favor of the Plaintiff, Furthermore, the Defendant's Motion for Attorneys' Fees and Expenses pursuant to 35 U.S.C. § 285 is DENIED. As no further claims or counterclaims remain, this case will be DISMISSED.

### JUDGMENT

For the reasons set forth in the Memorandum Opinion filed contemporaneously with this Judgment, it is ORDERED that Defendant Collezione Europa U.S.A., Inc. have and recover nothing from Plaintiff Victus, Ltd., d/b/a Master Design Furniture on its antitrust counterclaim. Moreover, Defendant Collezione Europa U.S.A., Inc.'s Motion for Attorneys' Fees and Expenses [Doc. # 61], pursuant to 35 U.S.C. § 285, is DENIED. As Judgment was entered on August 3, 1998 (Order [Doc. # 59]) against Plaintiff Victus, Ltd., d/b/a Master Design Furniture on Plaintiff's patent infringement claim, it is ORDERED that this case be and the same hereby is DISMISSED.